904 P.2d 1029 (1995)
Deborth Ann EARL, Appellant,
v.
The STATE of Nevada, Respondent.
No. 24948.
Supreme Court of Nevada.
November 1, 1995
*1030 Morgan D. Harris, Public Defender, and Thomas J. Gibson, Deputy, Clark County, for Appellant.
Frankie Sue Del Papa, Attorney General, Carson City; Stewart L. Bell, District Attorney, James Tufteland, Chief Deputy, and Owen Porterfield, Deputy, Clark County, for Respondent.

OPINION
YOUNG, Justice:

FACTS
Appellant Deborah Ann Earl ("Deborah") was convicted for the murder of Bruce Lawson ("Bruce"). At trial, Deborah argued that she killed Bruce in self-defense. Deborah testified that Bruce beat her and raped her in the past. Deborah's aunt witnessed Bruce hit Deborah on a previous occasion. In fact, Deborah testified that one week before the incident in question, Bruce struck her three times in the head with his fist.
There was also evidence that Bruce had abused other women. For example, police were called to the residence of Bruce's former girlfriend on four separate occasions because of domestic violence. In addition, Bruce bragged to Deborah that once he choked a woman until she urinated in her pants.
On November 8, 1992, Bruce, Deborah and Deborah's three children attended a party. While at the party, Bruce hit Deborah, causing her earring to fly off. In addition, she felt dizzy and her face became swollen. Deborah's eight-year-old son verified that he saw Bruce hit his mother. Later, while under the influence of alcohol and cocaine,[1] Bruce *1031 followed Deborah around the house. Deborah apparently became scared and called the police. When the officer arrived, Deborah sent him away and told him that nothing was wrong. Deborah testified that she sent the officer away because some people at the party did not want the police around, and Bruce said he would hit her again if she did not ask the officer to leave.
Deborah testified that after the officer left, Bruce continued to follow her around while aggressively grabbing at her. Deborah further testified that Bruce grabbed her while she was in the kitchen and pulled her away from the sink. After Bruce grabbed her, Deborah picked up a butcher knife and flashed it at him. She then went into the living room and Bruce continued to follow her. Deborah testified that although there were other people at the party, she became frightened when Bruce "lunged" into her, and she stabbed him.
On January 12, 1993, Deborah was convicted of second degree murder with use of a deadly weapon and sentenced to serve a life sentence for the murder charge and an additional life sentence for use of a deadly weapon. Deborah appeals and argues that there were eight different instances of error. We conclude that the exclusion of jury instructions on Deborah's theory of the case and damaging remarks made by the district court and the prosecutor justify reversal. Deborah's remaining arguments are without merit.

DISCUSSION

Jury instructions
Although Deborah alluded to the fact that she may have killed Bruce accidently, the only defense submitted to the jury was self-defense. Accordingly, Deborah argues that she was entitled to an instruction on the "no duty to retreat" rule. A person who reasonably believes that he is about to be killed or seriously injured by his assailant does not have a duty to retreat before using deadly force unless he is the original assailant. State v. Grimmett, 33 Nev. 531, 534, 112 P. 273, 273 (1910).
Deborah offered two instructions on the "no duty to retreat" rule. The language from the first instruction, labeled Instruction "C," is reproduced below:
[W]here a person without voluntarily seeking, provoking, inviting or willingly engaging in a difficulty of his own free will is attacked by assailant and is [sic] necessary for him to take the life of his attacker and to protect his own, then he need not flee for safety but has a right to stand his grounds and slay his adversary.
This instruction is from Grimmett, the leading Nevada case on the "no duty to retreat" rule.
This court has interpreted the "no duty to retreat" rule to mean that the person must reasonably believe he is about to be attacked with deadly force.[2]See Culverson v. State, 106 Nev. 484, 489, 797 P.2d 238, 242 (1990). Deborah's other instruction on the "no duty to retreat" rule, labeled Defendant's "E," incorporated this reasonable belief interpretation. The language from Defendant's "E" is reproduced below:
[A] person who is not the original aggressor has no duty to retreat before using deadly force if a reasonable person in the position of the non-aggressor [sic] would believe that the assailant is about to kill or I guess seize or cause  I think it's meant to say serious bodily harm  to the nonaggressor or any person in the presence or company of the nonaggressor.
The district court rejected both Deborah's proffered instructions. The district court rejected Instruction "C" "because of the complexity and because of the fact that the sum and substance has already been given." Where the district court refuses a jury instruction on defendant's theory of the case that is substantially covered by other instructions, it does not commit reversible error. Shannon v. State, 105 Nev. 782, 787, 783 P.2d 942, 945 (1989); Bean v. State, 81 Nev. 25, 34, 398 P.2d 251, 256 (1965), cert. denied, 384 U.S. 1012 (1966).
*1032 We conclude that the "no duty to retreat" rule was not substantially covered by other instructions in the case at bar. The only instruction submitted to the jury that addressed the "no duty to retreat" rule was a portion of instruction number 18. This instruction, as read by the district court, stated, "A person is not bound to retreat from his home even though a retreat might be safely made aware, fear of any of the offenses mentioned above to prevent which the homicide shall not be sufficient to justify the killing." We conclude that this instruction is more confusing than those proposed by Deborah and actually limits the "no duty to retreat" rule because Deborah was not in her own home when the stabbing occurred.
Although the instructions on self-defense that were submitted to the jury are extensive, whether Deborah should have retreated was also an issue in this case. Therefore, Deborah deserved to have a "no duty to retreat" instruction submitted to the jury. "[T]he defense has the right to have the jury instructed on its theory of the case as disclosed by the evidence, no matter how weak or incredible that evidence may be." Margetts v. State, 107 Nev. 616, 619, 818 P.2d 392, 394 (1991) (citation omitted) (emphasis added).
Where a district court refuses to give an instruction for a specific reason and the problem can be corrected in a substitute instruction, a substitute instruction should be requested. See Ford v. State, 99 Nev. 209, 212, 660 P.2d 992, 994 (1983). In this case, however, Deborah's attorney was not incorrect in failing to request a more precise "no duty to retreat" instruction. One of Deborah's proffered instructions was denied because the district court felt the sum and substance had already been given. Therefore, offering another instruction would have been in vain.
Although Bruce's mother testified that her son thought Deborah was "crazy," this should not preclude Deborah from fully instructing the jury on her theory of the case. Arguing that Deborah may have been the abusive partner, and therefore not defending herself on the night of the incident, is unsupportable by the facts of the case at bar.
The record reveals that Deborah feared Bruce on the night of the stabbing, and not vice versa. There was evidence that (1) Bruce beat and raped Deborah in the past  one incident where Bruce hit Deborah was confirmed by a witness; (2) one week before the homicide, Bruce hit Deborah three times in the head with his fist; (3) Deborah was aware that on four separate occasions, the police were called to the home of Bruce's former girlfriend because of domestic violence by Bruce; (4) Bruce bragged to Deborah that he once choked a woman until she urinated in her pants; (5) on the night of the homicide, Bruce ingested enough cocaine and consumed enough alcohol to cause "bizarre" behavior; and (6) also on the night of the homicide, Deborah's eight-year-old son witnessed Bruce hitting Deborah, causing her to become dizzy and her face to become swollen.
Although we recognize that there are occasions when women abuse men, those situations are irrelevant to the case at bar. The record definitely indicates that the abusive party in this domestic relationship was Bruce, and not Deborah.
As this court's precedents mandate, we conclude that Deborah was entitled to have the jury properly instructed on her theory of the case no matter how weak or incredible the evidence is that supports her theory. See Margetts, 107 Nev. at 619, 818 P.2d at 394; Barger v. State, 81 Nev. 548, 552, 407 P.2d 584, 586 (1965).
In light of the foregoing, we conclude that the district court erred in excluding Deborah's "no duty to retreat" instructions.

Judicial bias and prosecutorial misconduct
After a careful review of the record on appeal, we conclude that the district court and the prosecutor made several comments which were in error. Because the district court excluded the jury instructions, as discussed above, all errors need not be addressed to reach our disposition of this case. However, for clarity, we discuss several examples below. These errors individually may not have been prejudicial; however, together they reflect the cumulative nature of error that occurred during this trial.
*1033 The following are examples of the district court's actions:

Number One
[Deborah's attorney]: Was there, was he acting in the same way or was he acting differently than the other times he abused you?
The Court: If you object I will sustain.
[The State]: I object.
The Court: Sustained. The question will be stricken. And you are directed again to do it correctly or I will confine you too [sic] a new subject matter entirely. Do you understand me?
[Deborah's attorney]: Yes Your Honor.
After several more questions where Deborah's attorney led his own witness, the district court judge remarked, in front of the jury, "You know, I am going to take a five minute recess and I am going to tell you how to practice law." The district court then excused the jury, held Deborah's attorney in contempt, fined him $250.00, and threatened to put him in jail  all for leading his witness on a few questions.

Number Two
During the closing argument of Deborah's attorney, the district court judge asked Deborah's attorney to repeat one of the instructions that he had quoted incorrectly. Deborah's attorney then began to repeat the instruction to which the district court judge replied, "If you don't know it, I am saddened for you."

Number Three
Again during the closing argument of Deborah's attorney, he characterized Bruce as "grabbing, pulling and tearing... ." The prosecutor objected because there was no evidence of tearing. The district court judge then remarked, again in front of the jury, "There was no testimony from any source about any tearing. Your characterizations are too bizarre now. Maybe you better watch what you have been drinking." (Emphasis added.)
Contrary to the dissent, which mischaracterizes the district court's comments as "not so prejudicial," we believe that the district court's implications that Deborah's attorney was incompetent and intoxicated at the time of trial were clearly in error.

Number Four
During the prosecutor's closing argument, Deborah's attorney objected to the characterization of Deborah's testimony as "malarkey" to which the district court judge replied, "It is a good expression, amongst we Irish at least." The prosecutor then replied, "You stole my line."
The comment made by the prosecutor may have been harmless had the objection to it simply been sustained or overruled by the district court without further comment. However, the district court's response to the objection, stating that "malarkey" was a "good expression," could have readily led the jury to believe that the district court agreed with the prosecutor's characterization of Deborah's testimony.

Number Five
There was also at least one instance where the prosecutor may have acted inappropriately. As stated above, during the prosecutor's closing argument, he characterized Deborah's testimony as "malarkey." Specifically, the prosecutor stated, "And the stuff about, oh, I was so afraid he was going to do all the damage to me. You can tell from her own testimony, it was malarkey." This remark by the prosecutor violated his duty not to inject his personal beliefs into argument and, more appropriately, not to ridicule or belittle the defendant or the case. See Barron v. State, 105 Nev. 767, 780, 783 P.2d 444, 452 (1989) (citing McGuire v. State, 100 Nev. 153, 677 P.2d 1060 (1984)); see also, Ross v. State, 106 Nev. 924, 927, 803 P.2d 1104, 1106 (1990) (although demonstrating bias on the part of the witness is permissible, stating that the witness is lying is not); Witherow v. State, 104 Nev. 721, 765 P.2d 1153, 1155 (1988) (an opinion as to the veracity *1034 of a witness in circumstances where veracity might well have determined the ultimate issue of guilt or innocence is improper).
Although these references alone may not have amounted to prejudicial error, considering the cumulative effect of these errors and the fact that the evidence against Deborah was not overwhelming on the question of whether she had the required intent to commit second degree murder, Deborah's case was prejudiced in respect to a substantial right. See Sipsas v. State, 102 Nev. 119, 125, 716 P.2d 231, 235 (1986); Polito v. State, 71 Nev. 135, 140, 282 P.2d 801, 803 (1955).
We are not condoning Deborah's actions or proclaiming her innocence of any wrongdoing, nor are we freeing a murderer or liberating Deborah from the responsibility she must face during her new trial for the events which led to Bruce's death. Instead, we are acknowledging that Deborah was not afforded the opportunity to instruct the jury on the "no duty to retreat" rule. Also, we recognize that the district court and prosecutor made several comments which were in error.
Accordingly, we reverse Deborah's conviction and remand this case to the district court for a new trial.
SHEARING and ROSE, JJ., concur.
STEFFEN, C.J., and SPRINGER, J.,
SPRINGER, Justice, with whom
STEFFEN, C.J., agrees, dissenting:
This is a domestic violence case. "Domestic violence is a major problem, both in Nevada and in the United States. Domestic violence is the most common but least reported crime in the United States."[1] In this case a woman murdered her domestic partner.[2]
Early on in this dissent I want to make it very clear that this is not a case involving the so-called "battered-spouse syndrome." The courts have shown a growing sympathy to subjects of serious and chronic abuse who in an uncontrolled moment take the lives of their abusers under circumstances in which self-defense would not ordinarily furnish an excuse. The battered-spouse syndrome offers the possibility of a special form of self-defense to victims of chronic abuse, but this defense was not pursued in this case, probably because Ms. Earl's testimony indicated that she stabbed her boyfriend by accident rather than in defense of a deadly attack. According to Ms. Earl, "He ran into it (the kitchen knife)[[3]]; I didn't mean to kill him."
Ms. Earl and her now-dead domestic partner have a history of violence in their relationship.[4] *1035 On the day of the murder the couple was having an argument of some kind, during which Ms. Earl claims that the victim "started grabbing at me." Ms. Earl was not in fear at the time. She did not think that the stabbing-victim was going to hit her or otherwise harm her. In fact, she was pointedly asked during trial if she had "stabbed him to keep him from hitting you?" She answered the specific question in the negative and testified: "No. I didn't stab him to keep him from hitting me. I didn't want to stab him at all." It was, you see, all a big mistake. According to her testimony, Ms. Earl's intention in flashing the knife at her victim was quite simple: The "only thing I wanted him to do is go away." Unfortunately, during the time that she was flashing the knife at her boyfriend, he "ran into it" and killed himself.[5]
Ms. Earl luckily escaped a conviction of first-degree murder for intentionally killing her boyfriend. The jury convicted her of second-degree murder, an unintentional homicide based on "implied malice," which does not require an intentional killing but, rather, killing under circumstances which "show an abandoned and malignant heart." NRS 200.020.[6] The second-degree murder conviction is consistent with Ms. Earl's testimony that she did not intend to stab her boyfriend. It also represents a recognition by the jury that Ms. Earl did not stab her boyfriend in an attempt to save her own life from a deadly attack by him. All in all, self-defense is entirely inconsistent with Ms. Earl's version of the killing and has no part to play in this case. This being the case, I have a terribly hard time understanding why the majority justices would invalidate this murder conviction on the ground that the trial judge refused to instruct the jury that Ms. Earl had "no duty to retreat" when her boyfriend was "grabbing at" her and that she *1036 had the right to "stand her ground" and stab him to death.
A rule that allows a person to stab another because he or she is "grabbing at" that person is facially unsupportable; but I am even more troubled when I read the instruction which this court believes the trial court should have given the jury in this case. The majority says that Ms. Earl was entitled to an instruction telling the jury that she had the "right to stand his [sic] grounds (sic) and slay his [sic] adversary." The majority qualifies to some degree this newly-installed right to kill people who "grab at" you when it adds that Ms. Earl must, at the time she stabbed her boyfriend, also have believed that her boyfriend was "about to kill her" (grab her to death?) or at least do her "serious bodily harm." Because the trial judge refused to tell the jury about Ms. Earl's supposed right to "slay her adversary" under the circumstances described by her in her testimony, this court has decided to nullify her murder conviction. I am simply at a loss of words to say any more about the majority decision on this subject, because if the incorrectness of the decision is not apparent to the reader by now, I am sure that nothing that I might say further would clarify the matter.
The majority has yet another reason for freeing this murderer. The prosecutor told the jury: "You can tell from her testimony that it is malarkey." I stress the word "you" because the prosecutor was merely suggesting to the jury that it could very well conclude that Ms. Earl's testimony was malarkey. The prosecutor did not say that he thought the testimony was malarkey, he just said that he thought the jury could "tell" that this was the case. Obviously there is no prosecutorial misconduct here, but defense counsel objected to this argument anyway. The trial judge properly ruled in favor of the prosecution and in doing so made the harmless aside that "malarkey" was a "good expression, amongst us Irish at least." What can possibly be wrong with the judge having said this? I certainly cannot see anything even remotely wrong with the judge's saying, in effect, that "malarkey" is an acceptable slang expression, understood by everyone to mean "incredible."
Strangely, the majority thinks that the judge's saying that malarkey was a good Irish expression might have led the jury to believe that the judge himself might have been harboring the thought that Ms. Earl's testimony was malarkey. I do not understand why or how it could arrive at such a conclusion. Since I do not understand what the majority is getting at, I will not discuss this grounds for reversal any further. The other remarks of the trial judge upon which the majority relies in reversing this conviction certainly were not so prejudicial as to require this jury verdict to be set aside. If a court is going to grope for a reason for a desired result, it can always come up with something, as it has in this case. The trial in this case is close to being error-free, and I dissent from the judgment of this court reversing an eminently correct murder conviction.
NOTES
[1] An expert testified that Bruce had enough alcohol and cocaine in his blood to cause "bizarre behavior."
[2] Deadly force is defined as "force likely or intended to cause death or great bodily harm." Black's Law Dictionary 398 (6th ed. 1990) (emphasis added.)
[1] Domestic Violence: A Handbook for Victims and Professionals, Nevada Commission for Women, 1992.
[2] The majority opinion recounts some incidents of violence taken from the murderer's testimony. The victim, of course, could not testify as to the mutuality of the couple's violence because the victim was dead and could not testify concerning the murderer's past violence. We do know that the victim has expressed his fear of the murderer to his mother, had told his mother that he thought Ms. Earl was "crazy" and that he feared "something was going to happen" to him.

Whatever might be the history of domestic violence in this case, the murderer has not made out a case for application of a "battered spouse" defense, that is to say, one in which a victim of chronic abuse asserts a defense based on fears generated by past abuse rather than on traditional self-defense, under which there must be an immediate threat of great danger. This is a run-of-the-mill self-defense case, in which the murderer's defense suffers from her having testified that she was not afraid of her unarmed victim and that the stabbing was an accident. As pointed out in the text, her testimony that she was not in fear of harm when the victim "ran into" her kitchen knife removes this case from the self-defense realm. There is no basis at all, with or without the assistance of the "battered spouse" defense, for believing that at the time of the murder, the murderer was seeking "to protect" her own life or "believe[d] that the assailant [was] about to kill her"; consequently, she was entitled to neither of the instructions referred to in the majority opinion. A defendant may be entitled to an instruction, as put by the majority, "no matter how weak or incredible the evidence is," but there is not even any "weak" or "incredible" evidence in this case to support the requested instructions. Saying that this murder conviction should be overturned because the trial court refused to misinstruct the jury in the manner sought by the defendant does not present an acceptable reason for liberating this woman from the responsibility she must bear for murdering her boyfriend.
[3] The medical examiner in this case testified that it might be "possible but highly improbable" for the stab wound ("about four to six inches" in depth) to have been self-inflicted.
[4] Women commit one out of three domestic homicides. Uniform Crime Report, Bureau of Justice Statistics (1991). There are a number of studies that indicate, correctly or incorrectly, that women and men engage in violence in the home to a fairly equal degree. See, e.g., J. Frodi, J. McCaulay & P.R. Thome, Are Women Always Less Aggressive than Men? A Review of the Experimental Literature, Psychology Bulletin 634-660 (No. 4, 1977). Of every 100 families, 3.8 experience severe husband-to-wife violence, but even more, 4.5, experience severe wife-to-husband violence. M.A. Straus, R.J. Gelles, Suzanne K. Steinmetz, Behind Closed Doors: Violence in the American Family (1980). The number of violent acts by wives against husbands exceeds the number of violent acts by husbands against wives by 14 percent. M.A. Straus, Wife Beating: How Common and Why?, Victimology 443-58 (No. 2, 1977-1978). The rate of violence by husbands against wives is decreasing; while the rate of violence by wives against husbands is increasing. M.A. Straus & R.J. Gelles, Societal Change and Change in Family Violence From 1975 to 1985 as Revealed by Two National Surveys, Journal of Marriage and the Family (No. 48, 1986). These are some samples of the data on this subject.

Suzanne K. Steinmetz, Ph.D., professor of family studies at the University of Delaware, has written extensively on the subject, and she addresses the question as to why all of the attention is given to violence by men against women and virtually no attention to violence by women against men. Dr. Steinmetz puts it this way:
If violence against men is recognized in history, recognized by law, recognized by the comic strips, why has there been almost no attention given to this problem? There are several reasons. First ... case material has been lacking for abused males. Second, selective inattention, both by the media and by the researchers has been an influence... . It is not likely that feminist researchers and counselors will publicly acknowledge that males might also be victims.
Straus, Gelles, Steinmetz, supra.
[5] Those who might be inclined to believe Ms. Earl's testimony that the victim "lunged" at her outstretched knife-bearing hand and that he "ran into" the knife might also believe that he was committing suicide or, possibly, that he was trying to disarm her. Under either version there is no suggestion that the stabbing was anything other than an accidental misadventure. There is nothing here to suggest self-defense because Ms. Earl was not in fear, and nothing that the victim did was perceived by her as a threat of harm.
[6] "`[I]mplied malice ... does not relate to a deliberate, intentional killing, but is rather a mens rea inferred in law from the circumstances of the killing.'" McCurdy v. State, 107 Nev. 275, 278, 809 P.2d 1265, 1266 (1991) (quoting Keys v. State, 104 Nev. 736, 740, 766 P.2d 270, 272 (1988)). Implied malice may be present in cases where there is a malignant disregard and recklessness concerning life and safety of another. Keys, 104 Nev. 736, 766 P.2d 270. Stabbing a person who is "grabbing at" the victim may have been seen by the jury in this case as a "recklessness concerning life and safety" and, thus, as evidencing "implied malice" and as supporting a second-degree murder conviction.