BARBARA LYNCH BARRON, CAROL LYNN TOMLIN-SON, Appellants, v. THE STATE OF NEVADA, Respondent.

No. 18837

November 27, 1989 783 P.2d 444

*Lawrence J. Semenza,* Reno, for Appellant Barron.

*Lawrence D. Wishart,* Reno; Hager, Oakes & Mausert, Reno, for Appellant Tomlinson.

*Brian McKay,* Attorney General, Carson City; *Mills Lane,* District Attorney, *David Thompson* and *Gary H. Hatlestad,* Deputy District Attorneys, Washoe County, for Respondent.

## OPINION

*Per Curiam:*

Appellants Barbara Lynch Barron and Carol Lynn Tomlinson were convicted of multiple counts of embezzlement and obtaining money under false pretenses, and one count of racketeering arising out of their conduct as loan brokers at the failed mortgage brokerage firm of Lemons and Associates. Appellants submit: (1) that the district court erred by not properly instructing the jury; (2) that improper jury instructions resulted in parallel convictions for embezzlement and obtaining money by false pretenses; and (3) that the district attorney engaged in such numerous instances of prosecutorial misconduct as to mandate reversal with prejudice. We hold: (1) that the jury was adequately instructed; (2) that the appellants could be convicted of both embezzlement and obtaining money by false pretenses involving the same investor; and (3) that the prosecutorial misconduct that occurred does not mandate reversal of this case.

## FACTS

Appellants Barbara Lynch Barron (Barron) and Carol Lynn Tomlinson (Tomlinson) were employed at the mortgage brokerage firm of Lemons and Associates (L&A). L&A began business in 1977 as a small mortgage brokerage firm. In less that eight years L&A expanded from a small firm on Washington Street in Reno, to a multi-state, multi-function financial conglomerate, with offices in Reno, Las Vegas, Phoenix, Scottsdale, Tucson, and Boise.

While L&A held itself out as a mortgage broker, it is clear from the manner of business conducted by L&A that the operation was distinct from that of a traditional mortgage broker. A traditional mortgage broker acts as a middleman between the lender and a borrower, making its profit by taking a commission from the amount of the loan. Once the "brokering" has been done, the lender and borrower deal face to face. The borrower's name appears on the deed of trust taken back by the lender, with the risk of foreclosure or declining value falling on the lender. L&A was different in that L&A itself would fund the loan from internal sources, and would receive additional money from investors to maintain internal funds. The loans were made prior to the

receipt of the investments and without obtaining commitments for participating investments as a predicate to the issuance of loans. Investors placed their money with L&A, for which they received interest payments (18 percent per annum or more) within thirty days. They continued to receive interest payments regardless of loan performance, and received repayment of principal, regardless of whether principal had been paid to L&A. Barron and Tomlinson touted the risk-free character of investing with L&A, and in several cases took the life savings of those who invested.

By no later than 1982, L&A was experiencing financial difficulty. This was due to the number of nonperforming loans in L&A's portfolio. There was testimony that L&A had made several loans to "preferred customers" who were not expected to be able to repay any portion of the loans. The preferred loans totalled close to ten million dollars. L&A was unable to continue to pay 18 percent interest and to repay principal to investors, and simultaneously carry millions of dollars worth of bad loans.

By late 1982, L&A was operating a "Ponzi" or "Pyramid" scheme. L&A began to use the funds contributed by new investors to pay the previous investors. Additionally, L&A would over-assign investors into deeds of trust, selling greater than 100 percent of the value of the trust deed, as a regular policy. As an example of over-assignment, Tomlinson induced investor R.J. to invest $5,000 on August 31, 1983, with L&A to be secured by trust deed No. 456. The total value of the property securing trust deed No. 456 was $198,000. Tomlinson had assigned $199,000 worth of investment to No. 456 by September 9, 1982. By the time Tomlinson accepted R.J.'s investment, however, the level of investment assigned to trust deed No. 456 was already $298,884.

L&A's investment counselors would sell full or fractionalized interests in loans represented as secured by deeds of trust. From 1984 on, there were only three investment counselors in the Reno office—Gary Hill, who subsequently pleaded guilty to criminal charges arising out of his activities with L&A, and the appellants, Barron and Tomlinson.

In 1984 and 1985, the appellants counseled the vast majority of the Reno branch investors. The evidence introduced at trial showed that appellants knew the investments made through the Reno branch office were extraordinarily risky, yet they made no mention of this fact when soliciting investors. The evidence clearly demonstrated that appellants knowingly and regularly over-assigned by 400 percent, and sometimes more, loans secured by underlying trust deeds. By the time L&A went bankrupt early in 1985, at least 50 percent of all loans from the Reno branch were over-assigned. A report completed shortly before

L&A closed its doors revealed that over-assignment of loans at the Reno branch had become an eleven million dollar problem.

By 1983 the policy of over-assigning loans was the rule and not the exception in the Reno branch. As a result, appellant Barron instructed office employees to set up a double filing system—the pink and green file system—for present and future investment. The green file contained the paperwork for investors who had purchased up to 100 percent of the face value of the loan. The pink file was the overflow file, containing the paperwork of the oversold investments. In 1984, when state examiners requested to see the information on a particular file, they were only given the green file to review. Barron's testimony strongly suggested that the purpose of the dual filing system was to mislead the state examiners.

When L&A went bankrupt on April 10, 1985, 898 investors from the Reno branch discovered the true value of their investments. The bankruptcy estate showed a $26 million loss, of which only one-half was recoverable, resulting in a total loss to the investors of $13 million.

Barbara Barron was convicted of 14 counts of embezzlement or obtaining money under false pretenses, and one count of racketeering, and was sentenced to six years in the Nevada State Prison on each count to be served concurrently, with a $4,000 fine on each count. Carol Tomlinson was convicted of 20 counts of embezzlement or obtaining money under false pretenses, and one count of racketeering, and was sentenced on each count of embezzlement and obtaining money under false pretenses to three years in the Nevada State Prison to be served concurrently, with a $2,000 fine on each count. Tomlinson received a five-year suspended sentence for the racketeering conviction, with a $2,000 fine.

During trial, District Attorney Mills Lane made numerous remarks which appellants cite as prosecutorial misconduct. Mr. Lane made several objections to witnesses' testimony as being hearsay, stating in his objection that, if the defendants wished, they could produce that evidence or the hearsay declarant. Mr. Lane even made direct reference to the appellants' ability to testify. On cross-examination, one of the defense attorneys asked Alma Walsh, an investor, who testified as a witness in the State's case-in-chief, what Tomlinson said to her about the strength and security of L&A. Mr. Lane objected to this question:

> The question was what Ms. Tomlinson said. Tell me what Ms. Tomlinson said. That is hearsay. *If Miss Tomlinson has something to say, she can say it, not through this witness.*

(Emphasis added.) Later in the State's case-in-chief, a defense attorney asked Mary DeLa Cruz, Barron's secretary, when Barron told her that there was a problem with the financial stability of L&A. Mr. Lane again objected:

> Your Honor, if it please the Court, we haven't objected, but counsel knows statements—*if Miss Barron has got something to say, there's a way for her to say it.* You don't get in through defense what Miss Barron says through this witness. That's hearsay.

(Emphasis added.) The court instructed Mr. Lane to phrase his objections in legal terms and to refrain from other comments and arguments.

During closing argument Mr. Lane made statements that the appellants assert were improper because they expressed the prosecuting attorney's personal opinion and were disparaging of the appellants' case.

> Mr. Lane: I suggest to you, ladies and gentlemen, these people tried to hustle you just like they hustled those investors.
>
> Mr. Wishart: Objection, Your Honor, that's improper argument.
>
> Mr. Lane: I don't think it is improper argument. I will say it again. They tried to hustle you.
>
> Mr. Semenza: May we have a rule and admonition.
>
> The Court: You may proceed.
>
> Mr. Lane: They tried to hustle you, just like they tried to hustle those victims. . . .

Mr. Lane's rhetoric continued:

> Mr. Lane: Let me tell you something, based upon the facts in this case, and the evidence which was testified to by those victims, and the people that work there, we talked for 30 days thereabouts, about real estate. And based upon the facts, *if you accept what Barbara Barron and Carol Tomlinson told you, I got some ocean front property for you in Tonopah.*
>
> Mr. Wishart: Objection, improper argument.
>
> Mr. Semenza: Join in that, Your Honor.
>
> The Court: Let's move on from that Mr. Lane.

(Emphasis added.) Mr. Lane, however, insisted on repeating the substance of this statement a short time later:

> Mr. Lane: Well, I submit to you, if you believe that, based upon the evidence, I got ocean front property for you in Tonopah.

Mr. Wishart: I am going to object to that as improper argument.

The Court: Sustained. I previously directed you not to refer to that.

Mr. Semenza: Admonish the jury, please, Your Honor.

The Court: Ladies and gentlemen, when objections to argument are sustained, you are admonished not to consider the comments in argument.

## LEGAL DISCUSSION

### I. *Jury Instructions*

First, appellants contend that the district court erred by refusing to instruct the jury on their theory of the case. At trial, appellants attempted to portray themselves as loyal but unwitting employees who solicited investments with a good faith belief that L&A was conducting business in a legitimate manner. Appellants offered an instruction stating that good faith is a complete defense to the charge of obtaining money under false pretenses.

This court has held that a criminal defendant is entitled to have the jury instructed on the defendant's theory of the case, no matter how weak or incredible the evidence supporting the theory may be. Brooks v. State, 103 Nev. 611, 613, 747 P.2d 893, 895 (1987). The holding in *Brooks* is limited by the requirement that the instruction must correctly state the law. *Id.* at 614, 747 P.2d 895. Additionally, if a proffered instruction misstates the law or is adequately covered by other instructions, it need not be given. Cutler v. State, 93 Nev. 329, 335, 566 P.2d 809, 813 (1977). The district court concluded that appellants' proffered instruction misstated the law, and therefore rejected it.

Appellants offer no authority supporting their proposition that good faith is a complete defense to a charge of obtaining money under false pretenses. In Adler v. State, 95 Nev. 339, 344, 594 P.2d 725, 729 (1979), this court considered the relevancy of "good faith" to a charge of obtaining money by false pretenses. We upheld the trial court's instruction allowing the jury to consider the issue of "good faith" as bearing only on the question of intent. *Id.* at 344, 594 P.2d at 729. Additionally, we concluded that good faith was not a complete defense to a charge of obtaining money by false pretenses. *Id.* at 346, 594 P.2d at 730. Further, the remaining portions of appellants' rejected instruction were adequately covered by the instructions given. Accordingly, the district court properly rejected appellants' proffered instruction stating, that good faith was not a complete defense.

Appellants next contend that the district court failed to properly instruct the jury on the elements of the crimes of obtaining money under false pretenses and embezzlement. This contention is without merit.

Jury Instruction No. 13 set forth the statutory definition of the crime of obtaining money under false pretenses. *See* NRS 205.380. Instruction No. 14 set out the specific elements of the crime.[1] Instruction No. 15 defined the necessary intent to defraud.[2] These instructions standing alone adequately instructed the jury on the elements of the crime of obtaining money under false pretenses. *Accord,* Bright v. Sheriff, 90 Nev. 168, 170, 521 P.2d 371, 372 (1974) (Elements of crime of false pretenses are: (1) intent to defraud; (2) a false representation; (3) reliance on that representation; and, (4) that the victim be defrauded.)

Appellants' contention that the court improperly instructed the jury on the required intent necessary to sustain a conviction for embezzlement must also fail. Appellants' argument that the instructions as given allowed for conviction of innocent misusers, and therefore were defective and prejudicial, is not persuasive. The requisite intent as enunciated by statute and this court makes no requirement of an *animus furandi. See* Rose v. State, 86 Nev. 555, 557, 471 P.2d 262, 263 (1970); NRS 205.300(1). "The act

---

[1]Jury Instruction No. 14 provided:

In order to prove the commission of the crime of obtaining money by false pretenses each of the following elements must be proved:
1. That a person made or caused to be made to another person, by word, conduct or writing,
 a.) a representation which was not true, or
 b.) a concealment of a material fact, which above action was calculated to mislead the other.
2. That such person represented or concealed with the intent to defraud, (this intent to defraud required herein is defined in Instruction No. 15).
3. That the false representation or concealment was believed and relied upon by another and was a material cause of inducing the other person to part with his money or property, even if the false representation was not the sole cause, and
4. That the fraud was accomplished in that the other person parted with his money or property.

[2]Jury Instruction No. 15 provided:

An intent to defraud is an intent to deceive another person for the purpose of inducing him to part with property or to alter his position to his injury or risk, and to accomplish that purpose by some false statement, false representation of fact, wrongful concealment or suppression of truth, or by any other artifice or act calculated to deceive.

of diverting carries its built-in intent that speaks for itself, that is, the performance of the act, such as using money . . . for a purpose other than for which it was designated, makes the crime." 86 Nev. at 557, 471 P.2d at 263. The jury instructions pertaining to the crime of embezzlement, when read together as they must be, sufficiently instructed the jury upon the law as to intent. *See* Cupp v. Naughten, 414 U.S. 141, 38 L.Ed.2d 368, 94 S.Ct. 396 (1973) (jury instruction may not be read in isolation, but must be viewed in context of the overall charge). Further, we do not perceive any indication that the jury was confused or misinstructed.

▌

Appellants also contend that the district court failed to properly instruct the jury regarding the weight and importance to be given evidence of good character, and that this error mandates reversal with prejudice. The basis of this contention is that the court failed to give the instruction proffered by appellants and that the instruction ultimately given and contained in Instruction No. 26, should have been placed elsewhere.[3]

Appellants argue that the instruction should have included the sentence, "Character evidence alone may create a reasonable doubt of the defendant's guilt." They argue that the instruction as given told the jury to consider the character evidence together with, and in the same manner as, all other evidence in the case, and that no mention was made of "reasonable doubt" or that such evidence may justify acquittal. According to appellants, this deficiency amounts to reversible error.

▌

Appellants correctly point out that an accused is permitted a jury instruction on the legal effect of good character evidence produced at trial. *See* Emerson v. State, 98 Nev. 158, 162, 643

---

[3]Instruction No. 26 provided:

The degree of credit due a witness should be determined by his or her character, conduct, manner upon the stand, fears, bias, impartiality, reasonableness or unreasonableness of the statements he or she makes, and the strength or weakness of his or her recollections, are viewed in the light of all the other facts in evidence.

*You have heard evidence of defendant's character, that is, opinion evidence about a character trait of honesty. You should consider character evidence together with and in the same manner as all the other evidence in the case.*

If you believe that a witness has lied about any material fact in the case, you may disregard the entire testimony of that witness or any portion of his testimony which is not proved by other evidence.

(Emphasis added.)

P.2d 1212, 1214 (1982); Beddow v. State, 93 Nev. 619, 624, 572 P.2d 526, 529 (1977).

The district court's decision in this case to reject the proposed instruction, however, was not error because the proposed instruction was not a correct statement of the law. An instruction that states, "character evidence *alone* may create a reasonable doubt," allows the jury to consider character evidence in isolation, to the exclusion of everything else. "There is no good reason to consider any evidence standing alone. If a jury should ever consider evidence in isolation, character evidence is the wrong kind to single out." United States v. Burke, 781 F.2d 1234, 1239 (7th Cir. 1985). We agree with the court in *Burke,* which rejected an instruction identical to the proposed instruction in the instant case. The court of appeals stated:

> The "standing alone" instruction could readily be understood by the jury as permission (even a command) to acquit a defendant of good general character, even if the jurors are convinced that the defendant committed the acts with which he was charged. The instructions should not send this message. They should keep the jury's focus squarely on what matters—did the defendant commit the act charged, with the necessary mental state?

*Id.* at 1239. Appellants were entitled to an instruction on the legal effect of character evidence. *Beddow,* 93 Nev. at 626, 572 P.2d at 529. The district court did instruct the jury on the weight to be afforded evidence of good character. Had the judge failed to give the instruction, and had the evidence supporting conviction been weak, this issue would pose a more compelling argument for reversal. *See* Emerson v. State, 98 Nev. 158, 643 P.2d 1212 (1982) (conviction reversed because evidence was weak and the judge refused to give any instruction on good character).

Appellants also object to the placement of the instruction on good character evidence. Preliminarily, we observe that no authority supports the proposition that placement of a jury instruction is a matter for review, let alone a predicate for judicial error. That the instruction was included with a "credibility" instruction is not error. United States v. Marquardt, 786 F.2d 771, 783-84 (7th Cir. 1986). In *Marquardt,* a false pretenses case, the judge failed to give an instruction on character evidence after such evidence was presented at trial. Holding that the judge's failure to give the character instruction was not error, the court of appeals stated:

[T]he court's instruction "to consider all the evidence . . ." was sufficient and proper and the court's failure to specifically instruct the jury regarding character evidence was not error. Furthermore, assuming arguendo that the court's failure to so instruct the jury was erroneous, we fail to understand how the giving of the requested instruction would have had a "probable impact" on the jury's finding that Marquardt is guilty.

*Id.* at 784.

In this case the court instructed the jury on character evidence. Additionally, much of the evidence supporting conviction was documentary. There was testimony by office employees that appellants knew of and used a dual filing system in an effort to mislead investors and state investigators, and that they knowingly and substantially over-assigned trust deeds. The convictions did not hinge on the appellants' credibility alone and the evidence supporting the convictions was not weak.

Looking to *Marquardt,* if failure to give any instruction on character evidence is not error, where the conviction did not turn on the defendant's credibility, then it can hardly be error to give a character instruction, albeit arguably in the wrong place, where the conviction also did not turn on the appellants' credibility. Appellants have not sustained their burden of showing that a different result would have been obtained had the proposed instruction been given. Therefore, we hold that the district court did not err in the manner in which it instructed the jury regarding the weight to be given evidence of good character.

## II. *Prosecutorial Misconduct*

Appellants contend that the trial was infected with instances of prosecutorial misconduct of the type and in such quantity so as to mandate reversal with prejudice. The trial transcript contains several instances of misconduct committed by the District Attorney, Mills Lane. However, we conclude that in light of the overwhelming evidence supporting the convictions, the misconduct does not mandate reversal. *See* United States v. Hastings, 461 U.S. 499, 103 S.Ct. 1974, 76 L.Ed.2d 96 (1983).

By their own testimony, appellants admitted to knowingly over-assigning deeds of trust by as much as 400 percent. Documentary evidence suggested that in some instances the policy of over-assignment reached a level of 700 percent. Both appellants testified that they knew of and used the dual filing systems as a method of misrepresenting the true condition of the offered

investments. A more compelling case of guilt would be difficult to imagine.

While we recognize that reversal is an option where prejudicial prosecutorial misconduct is found, we realize that such is not the only remedy, nor the most appropriate. Reversal due to prosecutorial misconduct may prejudice society more than the prosecutor and increase the expense of the state and all concerned. Yates, 103 Nev. at 202, 734 P.2d at 1253.

With the foregoing in mind we address the issues appellants raise. The first area of prosecutorial misconduct results from Mr. Lane objecting to testimony as hearsay, and then stating that the defendants could have produced the declarant if they desired. These improper statements create two legal problems: first, they tend to shift the burden of proof from the State to the defendant; and second, when the reference is that the defendant can testify and establish such evidence, it is a reference to the defendant's ability or reluctance to take the stand and testify, which is forbidden by the Fifth Amendment of the United States Constitution.

It is a fundamental principle of criminal law that the State has the burden of proving the defendant guilty beyond a reasonable doubt and that the defendant is not obligated to take the stand or produce any evidence whatsoever. The tactic of stating that the defendant can produce certain evidence or testify on his or her own behalf is an attempt to shift the burden of proof and is improper. It suggests to the jury that it was the defendant's burden to produce proof by explaining the absence of witnesses or evidence. This implication is clearly inaccurate. *See* Mullaney v. Wilbur, 421 U.S. 684 (1975); In re Winship, 397 U.S. 358 (1970); Griffin v. California, 380 U.S. 609 (1965); Emerson v. State, 98 Nev. 158, 643 P.2d 1212 (1982).

The more serious problem created by the prosecutor's reference to the appellants' being able to testify is that it is an indirect reference to the appellants' ability and possible reluctance to take the stand and testify. The United States Constitution states that a defendant shall not "be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. The United States Supreme Court has held that direct references by a prosecutor to a defendant's decision not to testify, at any stage of the proceeding, is always a violation of the defendant's fifth amendment right against self-incrimination, and mandates reversal of the case. Griffin v. California, 380 U.S. 609 (1965); *see also* Franklin v. State, 98 Nev. 266, 642 P.2d 543 (1982).

Indirect references to a defendant's failure to testify are constitutionally impermissible if "the language used was manifestly intended to be or was of such a character that the jury would naturally and necessarily take it to be a comment on the defendant's failure to testify." *See* Barnes v. State, 97 Nev. 354, 630 P.2d 1221 (1981) (quoting United States v. Lyon, 397 F.2d 505, 509 (7th Cir. 1968), *cert. denied sub nom.* Lysczyk v. United States, 393 U.S. 846 (1968)).

In Deutscher v. State, 95 Nev. 669, 601 P.2d 407 (1979), we considered a similar remark made by a prosecutor in closing argument and the test to determine if the comment requires reversal of the case. We stated:

> The second comment occurred during the prosecutor's final argument when he said, "[The defendant] testified he then—excuse me. He stated during the video interview. . . ." This vague reference to the appellant's confession cannot be construed as a direct reference to his failure to testify. Layton v. State, 87 Nev. at 600, 491 P.2d at 47. The established test is whether the language was "manifestly intended or was of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to [respond]." Knowles v. United States, 224 F.2d 168, 170 (10th Cir. 1955). This non-deliberate, self-corrected statement by the prosecutor does not constitute a sufficient comment to mandate reversal. *See* Sanchez v. Heggie, 531 F.2d 964 (10th Cir. 1976).

95 Nev. at 682, 601 P.2d at 416.

While the district attorney unequivocally said that the defendants could testify to such facts if they wanted to, we do not find that these remarks were manifestly intended to convey to the jury that the defendants would fail to testify. Further, Barron and Tomlinson did ultimately testify, although claiming they were, in part, forced to do so by Mr. Lane's statements. Viewing the comments about the appellants being able to testify in the total context in which they were made and mindful of the overwhelming evidence of guilt in this case, we hold that such improper comments do not mandate reversal.

In the State's case-in-chief Mr. Lane compared the defense theory to a "hustle." Mr. Lane repeated the "hustle" comment in closing argument, notwithstanding that he had been directed by the court to proceed with his argument. We believe this comment

to be equal to the "red herring" remark in Pickworth v. State, 95 Nev. 547, 598 P.2d 626 (1979). The prosecutor in the *Pickworth* case told the jury in closing argument that the defendant's drug intoxication defense was a "red herring" interposed only in the hope that the jury would return a compromise verdict of second degree murder. We indicated that the remark was improper, and we were critical of the prosecution for disparaging legitimate defense tactics. As with this case, in *Pickworth* we affirmed the conviction because the evidence against the defendant was substantial, and there was very little evidence supporting the defense theory. *Id.* at 550, 598 P.2d at 627.

Mr. Lane argued twice during final argument that if the jury believed the defendants' testimony or defense theory, then he had "some ocean front property in Tonopah" that he wanted to sell. Mr. Lane repeated this comment after it was objected to as improper, and the court directed him to refrain from making such comments. Such statements may be good news copy or acceptable cocktail chatter, but they are improper when used in court by a prosecuting attorney. A criminal jury trial is not a verbal free-for-all. A prosecutor may not offer his personal opinion of the guilt or character of the accused. *See* Emerson v. State, 98 Nev. 158, 643 P.2d 1212 (1982); Pacheco v. State, 82 Nev. 172, 414 P.2d 100 (1966). Mr. Lane's statements were also a violation of a district attorney's duty not to ridicule or belittle the defendant or his case. *Accord,* McGuire v. State, 100 Nev. 153, 677 P.2d 1060 (1984). The appropriate way to comment, by the defense or the State, is simply to state that the prosecution's case or the defendant is not credible and then to show how the evidence supports that conclusion.

In *Yates, supra,* we admonished Mr. Lane for stating his own personal opinion on a defendant's guilt and making disparaging remarks about a defense witness and the defense attorney. While the improper remarks in this case are not as serious as those made in *Yates,* we caution Mr. Lane to avoid such improper comments.

### III. *Parallel Convictions*

Appellants contend that the separate charges of obtaining money by false pretenses and embezzlement arise out of alleged misappropriation of the same funds and resulted in two convictions for the same act. The third and final amended indictment charged 32 counts of embezzlement and false pretenses. Counts I through XVI charged false pretenses from particular investors on

particular dates. Counts XVII through XXXII renamed the same investors in the same order and charged embezzlement. The time frame in which the embezzlement took place for each investor began on the day of the investment as charged in the parallel count for false pretenses and ended uniformly on the date of bankruptcy, April 10, 1985.

Appellants contend that they were convicted of obtaining money by false pretenses and later embezzling the same funds. In Ex Parte Ricord, 11 Nev. 287, 292 (1876), this court agreed with the petitioner that he could not have both the authority to obtain the money lawfully, satisfying an element of the crime of embezzlement, and, at the same time, obtain the same money by false pretenses. In Point v. State, 102 Nev. 143, 147, 717 P.2d 38, 41 (1986), this court stated, "Where the accused cannot be convicted of both crimes, both convictions are reversible when the reviewing court cannot ascertain what verdict would have been returned by a properly instructed jury. Milanovich v. United States, 365 U.S. at 551."

Respondent submits that appellants were not held accountable for the same money in the parallel charges. We agree. Sufficient evidence supports the jury's conclusion that appellants did obtain some funds by false pretenses, and embezzle other funds from the same parties.

Specifically, Counts I and XVII charge false pretenses and embezzlement respectively. Both crimes were alleged to have been committed against W. H. Marke, and to have occurred on March 28, 1985. Because Marke's total investment of $327,000 was made over a period of time, in the form of several separate investments, appellants could have placed the earlier investments in "honest" accounts, rendering that money "legally obtained." Then, on March 28, when Marke entered into a $40,000 bogus investment, with a $15,000 personal check and a $25,000 rollover from an earlier investment, appellants could have embezzled the $25,000 and obtained the $15,000 by false pretenses. This explanation is applicable to the other three instances of parallel charges.

Additionally, the jury did find appellant Barron guilty of embezzlement as charged in Counts XXVIII through XXXI, while finding Barron not guilty of false pretenses in Counts XII through XV. The counts were "parallel," in that they related to the same victims. Barron was found guilty of false pretenses in Count III, and not guilty of embezzlement in Count XIX, both relating to transactions with Mr. R. Talley. Based on this differentiation in conviction, we hold that the jury was capable of understanding the differences between the two offenses.

## CONCLUSION

The appellants, Barron and Tomlinson, were given a fair trial and abundant evidence supports the judgments of conviction. The instructions given when viewed as a whole were adequate and delineated the crimes of embezzlement and obtaining money by false pretenses. There was sufficient evidence to support each conviction involving the same investor when such parallel convictions were returned by the jury.

The prosecutorial misconduct, while substantial, does not require the reversal of this case in view of the overwhelming evidence of guilt.

Accordingly, we affirm the judgments of conviction.