EDWARD LEE JONES, Appellant, v. THE
STATE OF NEVADA, Respondent.

No. 28176

April 24, 1997                                    937 P.2d 55

[Rehearing denied December 17, 1997]

*Paul E. Wommer,* Las Vegas; *Arnold Weinstock,* Las Vegas, for Appellant.

Frankie Sue Del Papa, Attorney General, Carson City; Stewart L. Bell, District Attorney, and Abbi Silver, Deputy District Attorney, Clark County, for Respondent.

## OPINION

By the Court, ROSE, J.:

On May 11, 1992, a jury convicted appellant Edward Lee Jones (Jones) of one count of murder with the use of a deadly weapon for the August 22, 1991 slaying of his girlfriend, Pamela Williams. Jones was sentenced to death on May 26, 1992. On appeal, this court reversed Jones' conviction and sentence and remanded the case for a new trial, due to ineffective assistance of counsel.

On November 8, 1995, following Jones' second trial, a jury found him guilty of one count of first degree murder with the use of a deadly weapon. At the penalty phase, ending November 14, 1995, the jury returned a special verdict, finding two aggravating circumstances—that the murder was committed by a person previously convicted of a felony involving use or threat of use of violence, and the murder involved the mutilation of the victim, and three mitigating circumstances—that the murder was committed while the defendant was under the influence of extreme mental or emotional disturbance, the defendant acted under duress or under the domination of another person, and other unspecified mitigating circumstances. The jury found that the aggravating circumstances outweighed the mitigating circumstances and imposed a sentence of death.

Jones filed this direct appeal challenging both his conviction and his sentence of death, alleging (1) prosecutorial misconduct in the guilt and penalty phases, (2) *Brady* violations, (3) violation of a discovery order, and (4) unfair surprise via testimony of an unendorsed witness.

We conclude that Jones' claims are without merit and affirm both the conviction and the sentence.

### FACTS

*Facts pertaining to the crime*

After a night of drinking and smoking crack cocaine with his brother (Gary), Jones returned to the trailer on North Nellis where he lived with his girlfriend, Pamela Williams (Williams), and Williams' two young children, Charlene (age six) and Demetrius (age three). Somewhere around 8:00 a.m. on August 22, 1991, Jones and Williams got into a fight. Charlene woke up to find her mother crying and struggling with Jones over what appeared to be a bank card. Jones told Charlene to go back to bed and led Williams into the master bedroom.

Charlene went back to sleep. At some point, Jones stuck his head into Charlene and Demetrius' room, and told Charlene that he would get her some cereal. Charlene woke up several hours later and Jones was gone. She went to the master bedroom to find her mother, but the door was locked. Charlene went to the kitchen and retrieved a fork, and then a knife, which she used to pry open her mother's bedroom door. Charlene discovered her mother's bloody corpse sprawled between the master bedroom and the entrance to the master bathroom. Charlene retreated to her room, where she cried herself to sleep. Then, at approximately 1:30 p.m., she woke up and ran to her neighbor's trailer in the adjacent lot. The neighbor checked on Williams, ascertained that she was dead, and called the police from her trailer, as the phone in Williams' trailer was not working.

While the police were en route to the Nellis trailer park, three members of the North Las Vegas Police Department were visiting Jones' brother's apartment complex to teach the owners how to minimize crime in the area. Two plain-clothed policemen, Herbert Brown (Brown) and Randy Wohlers (Wohlers), and one uniformed officer, Lester Morton (Morton), arrived at the complex to perform their "security survey" at approximately 2:00 p.m. At this time Jones was with Gary in Gary's apartment.

Officers Brown, Wohlers, and Morton rode the elevator up to the third floor of the building, where they were greeted by Rosalee Matthews (Matthews), the mother of Jones and Gary. Matthews testified that Jones had seemed worried about Williams and asked her to telephone the Nellis trailer to check on Williams. When Matthews told Jones that she could not get through to Williams, Gary asked Matthews to telephone the police or his probation officer because he was worried about the fact that he had been taking drugs while on parole. On her way to the pay telephone she met the three policemen and asked them to come to her son's apartment, stating "my boys would like to talk to you guys." The three men accompanied Matthews to Gary's apartment. Gary told Brown that he had been using illegal drugs and did not know what to do about a meeting with his probation officer scheduled for later that afternoon.

After advising Gary to be honest with his probation officer, Brown began speaking with Jones. Jones told Brown that he and his girlfriend had had a fight and that he thought that he had "hurt her bad." After Jones gave Brown the address where the fight had occurred, Brown instructed Morton to radio the communications bureau to notify the Metro police of the address; Brown recalled having heard over the police radio on his way to survey the Pecos apartments about a homicide at the Nellis trailer park. When Morton confirmed that there had been a murder at the address

given by Jones, Brown read Jones his *Miranda* rights, while Jones began to cry.

Meanwhile, Detectives Norman Ziola (Ziola) and Karen Good (Good) had arrived at the Nellis crime scene at approximately 2:30 p.m. After performing a cursory inspection of the interior of the trailer, Ziola was apprised of the information gleaned by the North Las Vegas policemen at Gary's apartment. Ziola proceeded to the Pecos apartments where he re-advised Jones of his *Miranda* rights and took Jones and his brother to the detective bureau. En route to the bureau, Jones signed a consent form allowing the police to search the Nellis trailer.

Detective Good was in charge of investigating the crime scene. She testified that she discovered Williams' body lying between the master bedroom and master bathroom, covered with a green quilt. Coagulated blood surrounded the head and shoulders of the body and partially dried blood stained the shirt worn by Williams, the quilt, a robe, and a pile of shorts, underwear, and shoes stacked in the room. After removing the quilt, police noted some thirty stab wounds to Williams' body and a blood covered butcher knife lying under Williams' right foot. In the bathroom, Good found blood in the sink and on the countertop, along with a Band-Aid box and an empty Band-Aid wrapper. A bloody palm print, which would later be identified as Jones' to the exclusion of all others, marred the bedroom wall by the doorway to the master bathroom.

The drawers of the bedroom dresser appeared ransacked, and papers were spread about the bed. Williams' children's birth certificates and Williams' personal identification card were found beneath her body. There was no sign of forced entry or theft; Williams' body still had numerous pieces of jewelry on it. There were no signs of disarray in the rest of the trailer; however, in the kitchen the third drawer down was open, in which the police observed a clean knife similar to the bloody one found in the master bedroom beneath the victim.

The forensic pathologist, Dr. Green, would later testify that Williams had been stabbed approximately thirty-five times in her upper torso and neck, front and back. Of the thirty plus stab wounds, three or four were superficial, the remainder pierced or severed various organs, including the windpipe, lungs, and liver. Dr. Green also noted the presence of many "defensive" wounds on Williams' arms and hands, that is, stab wounds "received in an act of trying to push away or get away from the weapon." Due to the severe injuries to the victim's neck, Dr. Green could not tell if Williams had been choked prior to her death.

In a recorded statement, Jones admitted to having choked and stabbed Williams at the trailer and said that he had left the knife

in the bedroom. On the tape, Ziola indicates that he started recording the statement at 3:25 p.m. and stopped the tape at 3:36 p.m. However, at trial the tape was played for the jury, and it ran for approximately four minutes and twenty seconds. Ziola stated that the times stated on the tape were approximate[1] and that he did not edit or stop the tape at any time during Jones' statement.

After giving his statement, Jones was taken to the Clark County Detention Center, where evidence was collected from Jones' person. Jones had splashes of blood on both of his legs and feet, from the knees down, and there was a laceration on Jones' right ring finger. Blood was withdrawn from Jones and tested for drugs and alcohol. The toxicology reports revealed no alcohol, but did indicate a high level of cocaine metabolite in Jones' blood sample. Jones' mother, Matthews, testified that she thought he was under the influence of a controlled substance when she saw him at the Pecos apartment on August 22, 1991. However, the police who questioned and apprehended Jones—Brown, Wohlers, Morton, and Ziola—testified that Jones appeared withdrawn, yet was lucid and articulate, and that none of them suspected that Jones was under the influence of a controlled substance. More-over, Dr. Green testified that the metabolite found in Jones' blood was merely an inactive byproduct of cocaine and would not have had any effect on an individual's brain functions.

Williams' sister, Jerrie Williams (Jerrie), testified that she had witnessed Jones in a heated argument with the victim on the evening before her death. LaVerne Caldwell (Caldwell), Williams' and Jerrie's mother, stated that the night before Williams' death, Jones came to Caldwell's house looking for Williams and acting mad and impatient. Caldwell and Jerrie both testified that Williams was making plans to end her relationship with Jones and move to Mississippi with her children and Jerrie. Jerrie testified that prior to her sister's murder, Jones was often away from home, but when he was with Williams, the two would argue. The prosecution questioned various witnesses about an incident that occurred the May before Williams' death where Jones argued with Williams and then cut his wrists in front of Williams and her children. Jones' expert psychologist, Dr. Hess, testified that this alleged suicide attempt may have been a ploy by Jones to manipulate Williams. The State referred to this alleged suicide attempt in both its opening and closing arguments.

Jones' mother and sister, Matthews and Debra Jones (Debra), testified that Williams and Jones had had a loving relationship and

---

[1]For instance, Ziola testified that he took the 3:25 p.m. time from the time noted on Jones' *Miranda* waiver, which had actually been signed one to four minutes before Ziola started the tape.

that the two never fought. In the second trial, Debra also testified that two days after Jones' arrest, she had discovered Gary extracting a blood-smeared photograph of Jones and Williams from Jones' automobile. At that time, Debra gave a statement to the police and turned over the bloody photograph, which was later returned at her request.

At the trial below, Matthews testified to having found Williams' necklace hidden behind a picture in the room occupied by Gary at her home (he moved in with her shortly after Jones' arrest). She also stated that Gary resented Williams for coming between Gary and Jones and that Gary had keys to the Nellis trailer. She testified that when she found Jones at Gary's Pecos apartment, he was wearing shorts and there was no blood on his legs or feet. Matthews testified at an evidentiary hearing held before the first trial in 1992, and none of these alleged facts were presented at that time, although Matthews did give a statement and delivered the necklace to the police after its discovery in Gary's room. Gary testified on Jones' behalf at the first trial.

*Facts pertaining to prosecutorial behavior*

In preparation for the first trial (held in 1992), the State's serologist analyzed the blood found on various pieces of evidence retrieved from the crime scene and compared his results to samples taken from Jones and Williams. The Las Vegas Metropolitan Police Department (Metro) crime laboratory did not have DNA testing capabilities at the time so the serologist performed an ABO blood type comparison.[2] He concluded that both Jones and Williams shared type O blood and that the blood samples also shared the same subgroup and subtype, and testified that he could not differentiate between the two parties' blood found on the evidence.

In preparation for the second trial, Jones' counsel successfully petitioned the court for funds to perform blood analyses. On June 16, 1995, just days before the originally scheduled trial date, the parties met before the district judge in an attempt to resolve an apparent misunderstanding. The prosecution was prepared to hand over vials of blood taken from Williams and Jones, however Jones' counsel demanded the blood spattered items retrieved from the Nellis trailer (the shorts, underwear, shoes, quilt, knife, etc.). The State did not want to relinquish the evidence, which was already marked and in the custody of the district court.

---

[2]In a bench conference, the district judge limited the prosecution's questions regarding Metro's DNA capabilities to two areas, the state of the lab's DNA technology in 1991-92 and the state of such technology at the time of the second trial. The State exceeded these restrictions, asking when DNA capabilities would be available, and was admonished by the judge.

Jones' counsel argued that the serologist's unusual findings (that the blood of the victim and Jones' were indistinguishable) warranted retesting by their expert, which would necessitate comparisons between the blood samples and the bloodied pieces of evidence. The State maintained that the defense had originally requested blood for alcohol testing and that "[t]here [was] absolutely no indication until a moment ago, that [Jones' counsel] wanted a murder weapon and he wanted those things taken out of evidence which is crucial to our case."

Finally, the district judge ended the debate, noting "[a]ll I can read is the Court minute. And the Court minute says blood. And now we're distinguishing between, well, do we want dry blood or liquid blood or blood on the weapon or blood in a vial or what did we want." The district judge ordered defense counsel and a member of the prosecution to take the evidence to the defense's expert, Dan Berkabile (Berkabile), for the express purpose of finding out what tests could be done, how long the tests would take, and if the results would likely contradict earlier conclusions.

The following week, the parties agreed to continue the trial date until October 23, 1995, and that the State would send the blood and all items requested by the defense to Brian Wraxall of the Serological Research Institute in Northern California. Jones' expert, Berkabile, recommended this particular laboratory, and its credibility was stipulated to by both sides. At a June 21, 1995 hearing, the district judge engaged defense counsel in the following exchange:

> THE COURT: Now, gentlemen, in order to avoid this problem in the future, I want an agreed upon date where everything concerning discovery will be finished in this case. And I want it far enough in advance of this October 23rd trial date so that we don't put this gentleman through any more delays. So, right now on this record, you guys pick it.
>
> [DEFENSE COUNSEL]: I believe we are prepared other than awaiting the results from this lab in California, which is a stipulated one. So, we're not going to send it out a second time. *Good, back [sic] or indifferent, however their information comes. . . .*
>
> THE COURT: *So, we're going to deal with the results whatever they are.*
>
> . . . .
>
> THE COURT: September 14th . . . is your cut off date. Everything that's going to be done in this case is going to be done by September 14th at 5:00.

(Emphasis added.) By the July 20, 1995 status check, the State had sent the requested evidence to Wraxall at the California laboratory.

At the September 14, 1995 status check, defense counsel complained about the fact that the DNA testing had not been completed prior to the court-imposed discovery cut-off date. The prosecution spoke with Wraxall at the laboratory, who stated that he could not complete his blood analysis until sometime around October 9, 1995. The defense replied, "Whichever way the information comes back, I don't think there's going to be enough time. And absolutely we do not want this continued under any circumstances." The State responded:

> [T]his was done at the request of the defense. *I don't care what we do with that property there.* I did this [sent the evidence to Wraxall] as an accommodation to [defense counsel].
>
> . . . .
>
> Not only did the defense request this DNA, they supplied us the name of Brian Wraxall. I did everything because it was what [defense counsel] wanted us to do.

(Emphasis added.)

The district judge asked Jones' counsel, "What do you want me to do?," to which the defense stated:

> I don't know what I want the Court to do at this point. I just want the record to reflect that we are not going to stipulate or agree to a continuation of the discovery cut-off date. *If, in fact, it comes back that there is something exculpatory to the defense, we would like to know about it obviously; however, we are not going to agree to allow the State to use this evidence if it is not back by the discovery cut-off date, which was today.*

(Emphasis added.) The district court did not rule on the issue at that time.

On October 18, 1995, the State called the laboratory and Wraxall gave his preliminary results over the telephone. The next day the State telephoned defense counsel with that information. On October 20, 1995 (three days before trial), the State received Wraxall's "Preliminary Analytical Report" which indicated that a combination of Jones' and Williams' blood had been found on the tested items. The State then faxed a copy of Wraxall's report to Jones' counsel.

On October 20, 1995, Jones' counsel filed a motion to dismiss/suppress evidence for the State's alleged violation of the discovery order. On October 23, 1995, the district court held a hearing

and subsequently denied Jones' motion to suppress the blood/ DNA evidence. Immediately preceding Wraxall's taking the stand, Jones' counsel objected to his testimony on the grounds that the State had failed to endorse Wraxall as a witness. The district court ruled, "Well, both of you [prosecution and defense] agreed to Mr. Wraxall, as far as my notes indicate, so your objection to him testifying this morning is overruled."

At the conclusion of the State's case in chief, Jones' counsel moved to strike Wraxall's testimony, once again citing the prosecution's failure to endorse Wraxall as a witness. At the close of the defense's case in chief, the district judge denied Jones' motion to strike Wraxall's testimony. The jury rendered a guilty verdict on November 8, 1995. The penalty phase followed, concluding November 14, 1995, with the imposition of a death sentence.

During closing arguments at the penalty phase, both the defense and the prosecution made questionable statements to the jury. At one point the prosecution analogized Jones to a rabid animal, and at another, suggested that weapons found in Jones' cell before the trial could have been meant for use on members of the jury.

Jones also takes issue with the prosecutor's statement that Jones possessed a "special death penalty quality:"

> [PROSECUTOR]: Undoubtedly, ladies and gentlemen, as she was getting stabbed over and over repeatedly she cried out and begged for her life, and she begged to stay alive on behalf of those children of hers. *Can you imagine the special quality of a person who can do this? That's the special death penalty quality of this defendant, Mr. Jones.*

(Emphasis added.) These statements and various other actions taken by the prosecution during this trial form the basis for Jones' present appeal.

## DISCUSSION

### *The prosecutorial misconduct did not constitute reversible error*

Jones asserts that the following actions taken by the prosecution in the guilt and penalty phases of his trial constituted reversible error: (1) improper referral to Jones' alleged suicide attempt during closing argument in the guilt phase; (2) exceeding the scope of questions approved by the district court regarding Metro's DNA capabilities in the guilt phase; (3) refusing to release blood evidence to the defense for independent analysis; (4) implying that Jones behaved like a "rabid animal" in the presence of the jury during the penalty phase; (5) intimating

during the penalty phase that weapons found in Jones' cell could be used against jurors, and if the jurors did not return a verdict of death in this case Jones could kill them; (6) arguing that this case involved a "special death penalty quality" during closing arguments in the penalty phase.

1. *Alleged prosecutorial misconduct during the guilt phase*

a. *Refusal to release blood evidence to the defense for independent analysis*

Jones maintains that "the prosecution steadfastly refused to release blood evidence to the defense for independent analysis." The record reflects that the State resisted turning over the murder weapon and other bloodied evidence to the defense three days before trial was set to commence; however, the record also shows that despite the misunderstanding as to what items constituted "blood evidence," the State relinquished all requested items to Wraxall, a DNA expert selected by the defense, for analysis. Therefore, we conclude that this claim is without merit.

b. *References to Jones' alleged suicide attempt*

In opening statements of the guilt phase, the State argued:

> [A]round May of 1991 things were not so good in their relationship, and Pamela [Williams] wanted to leave . . . [a]nd in order to stop her from leaving, you will hear testimony from the witnesses, as well as medical documentation that shows that the defendant attempted to kill himself in front of her. And he got that sympathy, and she came back to him . . . .

Jones failed to object to this statement at trial. Failure to object in the district court precludes consideration of the issue on appeal; however, this court may address plain error *sua sponte*. Sterling v. State, 108 Nev. 391, 394, 834 P.2d 400, 402 (1992). Because we conclude that the mention of the suicide attempt was not plain error, we will not consider this issue.

During the cross-examination of Jones' expert psychologist, Dr. Hess, the prosecutor asked Dr. Hess if he was aware of a suicide attempt by Jones some months before the murder. Jones' purports that this line of questioning constituted prosecutorial misconduct, however, we construe his argument as one concerning the admissibility of evidence regarding his suicide attempt. The decision to admit or exclude evidence, after balancing the

prejudicial effect against the probative value, is within the discretion of the trial judge, and such a decision will not be overturned absent manifest error. Petrocelli v. State, 101 Nev. 46, 52, 692 P.2d 503, 508 (1985). We conclude that it was not manifest error to permit introduction of evidence regarding Jones' alleged suicide attempt in May of 1991, and that it was not misconduct for the prosecutor to pursue this line of questioning.

During the guilt phase closing argument, Jones' counsel objected when the State argued that Jones slit his wrists in front of Williams during an argument, in which she was attempting to leave him. During closing argument, the prosecution can argue inferences from the evidence and offer conclusions on contested issues. *See* Domingues v. State, 112 Nev. 683, 696, 917 P.2d 1364, 1373 (1996) (citing Collins v. State, 87 Nev. 436, 439, 488 P.2d 544, 545 (1971) (holding that the prosecutor's statements in closing argument, when made as a deduction or conclusion from the evidence introduced in the trial, are permissible). Reviewing the testimony of Williams' family and Jones' own expert, Dr. Hess, we conclude that the State's argument was not improper, and further conclude that the evidence adduced at trial supported the State's argued deductions and the conclusions asserted in closing argument.

### c. *Question regarding Metro's DNA capabilities*

The prosecutor disobeyed the court's directive in asking the serologist when he expected the police department to have DNA capabilities. In light of the judge's explicit limitations on questions pertaining to this subject we conclude that the State acted improperly, but conclude that no unfair prejudice resulted to Jones. "[A] criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone . . . ." United States v. Young, 470 U.S. 1, 11 (1985). This court must determine whether any misconduct was so prejudicial as to deny Jones a fair trial. Jones v. State, 101 Nev. 573, 577, 707 P.2d 1128, 1131 (1985). We conclude that to the extent any prosecutorial misconduct occurred, it was harmless error.

In instances where there is overwhelming evidence of guilt presented to the jury, even aggravated misconduct may be deemed harmless error. *See* Riley v. State, 107 Nev. 205, 213, 808 P.2d 551, 556 (1991); Barron v. State, 105 Nev. 767, 777, 783 P.2d 444, 452 (1989). In the instant case, there was over-

whelming evidence of Jones' guilt presented to the jury during his trial. Among other things, Jones confessed to stabbing Williams, her blood was splattered on his legs, and he left a bloody palm print above her body. The conviction should stand when the verdict is free from doubt. *Riley,* 107 Nev. at 213, 808 P.2d at 556.

### 2. *Alleged prosecutorial misconduct during the penalty phase*

*Attributing a "special death penalty quality" to Jones, inciting fear of Jones' future dangerousness, and referring to Jones as a "rabid animal" in the penalty phase closing argument*

Jones offers no specific argument or authority to support his claim that the State's attribution of a "special death penalty quality" to the defendant constituted error. We conclude that this unsupported contention should be summarily rejected on appeal. *See* Bennett v. Fidelity & Deposit Co., 98 Nev. 449, 453, 652 P.2d 1178, 1181 (refusing to consider merits when authority not cited); McKinney v. Sheriff, 93 Nev. 70, 71, 560 P.2d 151, 151 (1977) (stating that contentions unsupported by authority are to be summarily rejected). Moreover, a prosecutor's principal objective in penalty phase argument is to convince the jury that the convicted defendant is deserving of the punishment sought. We conclude that the prosecution was merely arguing that Jones' heinous crime was worthy of the death penalty.

As to the State's warning that Jones' weapons could have been meant for inflicting harm on the jurors themselves, we conclude that this portion of the statement was clearly inflammatory; however, the statement did not unfairly prejudice Jones in light of the overwhelming evidence of his guilt.[3] Moreover, the remainder of the statement in which the prosecutor referred to Jones' propensity for violence falls within the ambit of a "future danger-

---

[3]Notwithstanding the dissent's assertion that there was little evidence to support the jury's verdict of first degree murder, we note that "[t]he nature and extent of the injuries, coupled with repeated blows, constitutes substantial evidence of willfulness, premeditation and deliberation." Jones did not stab Williams once, twice, or even ten times; he plunged the knife into her body *thirty-six* times. On these facts, we conclude that there was indeed overwhelming evidence upon which the jury could have found Jones guilty of first-degree murder. *Cf.* Payne v. State, 81 Nev. 503, 508-09, 406 P.2d 922, 925-26 (1965) ("one may be guilty of murder in the first degree although the intent to commit such a homicide is formed 'at the very moment the fatal shot [is] fired' ").

ousness'' argument which has been held permissible on numerous occasions. *See* Witter v. State, 112 Nev. 908, 927-28, 921 P.2d 886, 899 (1996) (holding that prosecutor's future dangerousness argument was proper where shank was found in defendant's cell); Haberstroh v. State, 105 Nev. 739, 741-42, 782 P.2d 1343, 1344 (1989) (concluding no misconduct where the prosecutor told the jury that a piece of angle iron had been found in the defendant's possession while in jail and stated that defendant could pose a future threat to others).

Moreover, in Redmen v. State, 108 Nev. 227, 235, 828 P.2d 395, 400 (1992), *overruled on other grounds by* Alford v. State, 111 Nev. 1409, 906 P.2d 714 (1995), this court concluded that it would even ''allow prosecutors to argue the future dangerousness of a defendant . . . when there is no evidence of violence independent of the murder in question.'' In the instant case, the jury had received a plethora of evidence concerning Jones' violent tendencies, prior to the delivery of the State's remarks regarding Jones' propensity for violence. We conclude that given this evidence, along with the murder itself, there were clear facts to support an argument of future dangerousness. However, we admonish the prosecutor for suggesting that Jones' violent tendencies could be visited upon individual jurors.

Finally, we conclude that likening Jones to a rabid animal was misconduct, but that the misconduct was harmless error in light of the aforementioned overwhelming evidence of guilt. This court has previously warned that ''such toying with the jurors' imagination is risky and the responsibility of the prosecutor is to avoid the use of language that might deprive a defendant of a fair trial.'' Pacheco v. State, 82 Nev. 172, 180, 414 P.2d 100, 104 (1966) (discussing prosecutor's statement calling a defendant a ''mad dog.''). The prosecutor's reference to Jones as a rabid animal was indeed risky behavior and was wholly unnecessary. Although the State argues that it was ''simply pointing out the heinous nature of the defendant's past conduct and his utter disregard for the sanctity of life,'' we conclude that there was ample evidence from which the jury could have drawn that very same conclusion in the absence of the prosecution's demeaning and unprofessional remarks.

Notwithstanding these improper comments made by the prosecutor during the penalty phase, we conclude that in light of the overwhelming evidence of Jones' guilt, the prosecutor's misconduct constituted harmless error. Because the verdict was free from doubt we will not reverse, however, we caution the prosecu-

tion that with a weaker case, such misconduct might very well constitute reversible error.

### *The State did not violate Brady requirements*

Jones argues that the State violated the holding of Brady v. Maryland, 373 U.S. 83, 87 (1963), and its progeny in that potentially exculpatory statements given to police by his mother, Matthews, and sister, Debra, several days after Williams' murder were kept from the defense until the second day of jury selection. The State maintains that these two statements had been in the prosecution's file since 1991 and the file had been readily available to the defense under the State's open file policy since that time.

There is no way for this court to determine whether or not these statements were made available to Jones; the State says that they were in the file, and the defense says that they were not. The district court listened to these facts as presented by both parties and subsequently denied Jones' motion to dismiss the case and/or sanction the State for alleged *Brady* violations. A district court's determinations of fact will not be set aside if they are supported by substantial evidence. Tomarchio v. State, 99 Nev. 572, 575, 665 P.2d 804, 806 (1983). We conclude that the trial court's determination that these statements were made available to the defense was supported by substantial evidence.

Jones argues that Jimenez v. State, 112 Nev. 610, 618, 918 P.2d 687, 692 (1996), is apposite to his claim on appeal, quoting the opinion for the principle that ''[i]t is a violation of due process for the prosecutor to withhold exculpatory evidence, and his motive for doing so is immaterial.'' Jones argues that ''the State fought the disclosure of evidence to the defense,'' claiming that the State opposed a subpoena for Jones' police file, served on the first day of trial, and refused to allow defense counsel access to the police file.

These facts are distinguishable from *Jimenez* in that, as the record reveals, the defense had an adequate opportunity to present the testimony of Matthews and Debra during its case in chief and made use of the allegedly withheld statements at that time. In *Jimenez,* the defense was hindered in presenting certain exculpatory evidence to the jury due to the State's failure to disclose potentially exculpatory evidence. *Jimenez,* 112 Nev. at 620, 918 P.2d at 693.

As evidenced by the testimony of Matthews and Debra, in the instant case the jury was able to hear that both women had found

Williams' property in Gary's possession shortly after Williams' death, along with any other potentially exculpatory evidence contained in Matthews' and Debra's 1991 police statements. Therefore, we conclude that there were no *Brady* violations in regards to these statements, and even if there were, the result was harmless error because the substance of the statements reached the jury for consideration.

## *The State did not violate the discovery deadline*

On appeal, Jones argues that the district court erred in allowing the State to introduce DNA evidence at trial because the DNA expert's report was not available to either side at the discovery deadline of September 14, 1995. We conclude that Jones' claim is meritless.

"A trial court is vested with broad discretion in fashioning a remedy when, during the course of the proceedings, a party is made aware that another party has failed to comply fully with a discovery order." Langford v. State, 95 Nev. 631, 635, 600 P.2d 231, 234 (1979). This court "will not find an abuse of discretion in such circumstances unless there is a showing that the State has acted in bad faith, or that the non-disclosure results in substantial prejudice to appellant . . . ." *Id.* We conclude that the district court did not abuse its discretion in permitting the DNA results to be admitted into evidence.

First, we note that the State did not act in bad faith. The State made all reasonable efforts to procure the DNA results before the discovery deadline. The State had sent the materials to Wraxall by July of 1995, approximately two months prior to the deadline. The delay in receiving the results was attributable to Wraxall, and not to the State.

Furthermore, Jones was not prejudiced by the delay. Prior to the evidence being sent to Wraxall, Jones' counsel explicitly told the trial judge that the defense would accept the results of Wraxall's analysis, be they exculpatory or inculpatory. Additionally, the State followed up on the evidence sent to Wraxall, informing the district court and Jones' counsel of its findings. The prosecution at no time withheld the information received from Wraxall and gave the results to defense counsel shortly after receipt, on October 19, 1995.

In the instant case, Jones knew that the report from Wraxall would be forthcoming and in fact noted in his motion to dismiss, dated three days before trial (October 20, 1995), that "[d]uring its case-in-chief, the State of Nevada will attempt to introduce blood/DNA evidence. . . ." On June 21, 1995, the defense told

the district court that it would accept Wraxall's results, good or bad. However, in his October motion to dismiss, Jones' counsel complained that he would not have adequate time to hire an expert to attack Wraxall's findings. On these facts, we conclude that the State did not act in bad faith and that Jones was not prejudiced by any delay.

*The district court did not commit reversible error in permitting unendorsed witness Brian Wraxall to testify*

In a related issue, Jones claims that the State's failure to strictly comply with the provisions of NRS 173.045(2),[4] which requires endorsement of prosecution witnesses, necessitates reversal of his conviction. In the second week of trial, the State called an unendorsed witness, DNA expert Wraxall, to testify during its case in chief.

Nevada law clearly allows witnesses to be endorsed even after trial has begun:

> [U]nder statutes such as ours the indorsement of names of witnesses upon an information is largely a matter of discretion with the court; and, in the absence of a showing of abuse, or that some substantial injury has resulted to the accused, an order permitting such indorsement, even after the trial has commenced, does not constitute of itself reversible error.

State v. Monahan, 50 Nev. 27, 35, 249 P. 566, 569 (1926). However, in the instant case, the State *never* endorsed Wraxall, neither before, nor during the trial.

In Dalby v. State, 81 Nev. 517, 519, 406 P.2d 916, 917 (1965), this court held that where the name and address of an unendorsed witness was known to the defendant and an opportunity was afforded to the defendant to interview the witness during an evening recess, there was no prejudicial error in permitting the witness to testify. However, there is "a presumption that a witness called to testify whose name is not endorsed on the information is one who was not before known to the district attorney." *Id.* at 519, 406 P.2d at 917.

---

[4]NRS 173.045(2) provides, in pertinent part, that:

> The district attorney . . . shall endorse thereon the names of such witnesses as are known to him at the time of filing the information, and shall also endorse upon the information the names of such other witnesses as may become known to him before the trial at such time as the court may, by rule or otherwise, prescribe; but this does not preclude the calling of witnesses whose names, or the materiality of whose testimony, are first learned by the district attorney . . . upon the trial. . . . He shall not endorse the name of any witness whom he does not reasonably expect to call.

We conclude that Nevada case law establishes that failure to endorse a witness constitutes reversible error only where the defendant has been prejudiced by the omission. Redmen v. State, 108 Nev. 227, 234, 828 P.2d 395, 400 (1992). While the State did commit procedural error, we conclude that this error did not prejudice Jones because Wraxall was chosen by the defense to analyze the blood; thus Jones' counsel knew Wraxall's name and address as early as June of 1995. Moreover, the defense stated in an October 20th motion that the State *would* be presenting the DNA evidence, and counsel received a copy of Wraxall's report before the trial began. Finally, Wraxall was not called to the stand until the second week of Jones' trial.

*The death sentence was not excessive considering the crime and the defendant*

In concluding that the death penalty was not excessive, this court has looked to the heinous nature of the killing. Libby v. State, 109 Nev. 905, 919, 859 P.2d 1050, 1059 (1993), *vacated on other grounds by* Libby v. Nevada, 516 U.S. 1037, 116 S. Ct. 691 (1996). In the instant case, not only did Jones stab Williams at least thirty-five times with a kitchen knife, he committed this atrocity in the bedroom next to the victim's sleeping children. Although he locked the bedroom door, it was six-year-old Charlene who discovered her mother's bloody corpse.

Besides the armed robbery conviction, the jury heard testimony regarding other violent acts perpetrated by Jones. The evidence indicated that Jones has battered correction officers and detention center workers, threatened his own mother with a gun, beat up a previous girlfriend, and roughly a month before Williams' murder, had shot and wounded a man in an altercation.

In light of the heinous crime and Jones' propensity for violence, we conclude that the death sentence was not excessive.

1. *The evidence presented supported the finding of the aggravating circumstances*

Although Jones does not address this issue on appeal, NRS 177.055(2)[5] requires this court to examine the record and deter-

---

[5]NRS 177.055(2) provides, in pertinent part, that this court shall consider:

(b) Whether the evidence supports the finding of an aggravating circumstance or circumstances;

(c) Whether the sentence of death was imposed under the influence of passion, prejudice or any arbitrary factor; and

mine whether the evidence supports the finding of the aggravating circumstances. In the penalty phase, pursuant to NRS 200.033, the jury found two aggravating circumstances weighing against Jones: (1) the murder was committed by a person who was previously convicted of a felony involving the use or threat of violence to the person of another, and (2) the murder involved mutilation of the victim.

### a. *Prior conviction of a violent felony*

During the penalty phase, the State properly introduced Jones' 1981 conviction for robbing a grocery store at gun point as evidence of an aggravating factor. We conclude that this earlier conviction clearly supports a finding of the aggravating circumstance of prior conviction of a felony involving threat of violence to another. *See generally* Parker v. State, 109 Nev. 383, 393, 849 P.2d 1062, 1068 (1993).

### b. *Mutilation of the victim*

The district court defined mutilation for the jury as "to cut off or permanently destroy a limb or essential part of the body or to cut off or alter radically so as to make imperfect." This court approved the use of this definition in Deutscher v. State, 95 Nev. 669, 677, 601 P.2d 407, 413 (1979), *vacated on other grounds by* Angelone v. Deutscher, 500 U.S. 901 (1991). We conclude that the evidence adduced during the guilt and penalty phases of Jones' trial support the finding of this aggravating circumstance. Specifically, the pathologist testified to thirty-five or more wounds (only three or four of which were deemed superficial), at least one of which severed Williams' windpipe and part of her neck. One of the stabs to the chest was thrust so hard that the knife plunged entirely through her body to her back. In addition to a cluster of seven wounds to her right breast, Williams' lungs and liver had been pierced by one of the stabs. Moreover, Dr. Green found multiple "defensive wounds" to Williams' hands and arms, indicating a futile attempt to protect herself from the repeated blows of the knife.

Therefore, we conclude that the evidence supports the findings of the enumerated aggravating factors, and this issue is affirmed on appeal.

---

(d) Whether the sentence of death is excessive, considering both the crime and the defendant.

*The death sentence was not imposed under the influence of passion, prejudice, or any arbitrary factor*

Jones does not raise this issue on appeal, however NRS 177.055(2) compels this court to address the issue. We conclude that the record contains sufficient evidence upon which the jury could have found that the aggravating circumstances outweighed the mitigating circumstances and thus rendered a death sentence without passion, prejudice, or any arbitrary factor.

## CONCLUSION

We conclude that although Jones may not have received a perfect trial, he did receive a fair trial, which is what the law requires. Ross v. State, 106 Nev. 924, 927, 803 P.2d 1104, 1105 (1990). The State did engage in misconduct during its penalty phase closing argument; however, in light of the overwhelming evidence of Jones' guilt, we conclude that reversal on this claim is not warranted. We further conclude that Jones' claims of *Brady* and discovery violations, and any other instances of prosecutorial misconduct, are meritless. The State did commit a technical error in failing to endorse Wraxall as a witness, but we conclude that Jones was not prejudiced or unfairly surprised by Wraxall's testimony; thus the error was harmless. Having determined that Jones fairly tried, convicted and sentenced, we affirm in all respects the judgment of conviction and sentence imposed thereon.[6]

SHEARING, C. J., and YOUNG, J., concur.

SPRINGER, J., dissenting:

I dissent to the judgment of conviction and to the death penalty judgment. With respect to the judgment of conviction I agree with the majority that the prosecutor was guilty of misconduct and that the language used by the prosecutor was "clearly inflammatory." I agree with the majority that the prosecutor engaged in the use of "demeaning and unprofessional remarks" and that the prosecutor's references to the defendant as a rabid animal were "wholly unnecessary." Further, I agree with the majority that the "improper comments made by the prosecutor" were indeed "prosecutor's misconduct."

I would join with the majority in "admonish[ing] the prosecutor for suggesting that Jones' violent tendencies could be visited

---

[6]THE HONORABLE A. WILLIAM MAUPIN, Justice, did not participate in the decision of this matter.

upon individual jurors''; but I would not, like the majority, sweep all of this misconduct under the rug and let the prosecutor engage in all of this misconduct without paying any price for it.

The majority says that there is "overwhelming evidence" of *guilt* in this case. What the majority should have said is that there is overwhelming evidence of *homicide* committed by Jones. There is, of course, a big difference between the two. In this case, for example, proof that Jones is guilty of intentional, deliberated first-degree murder is anything but overwhelming; in fact, it is quite weak. This is a crime of passion. As stated in the majority opinion, Jones and Williams (his girlfriend) got into a fight and were "struggling . . . over what appeared to be a bank card." The homicide was committed "after a night of drinking and smoking crack cocaine." There is no question that Jones killed his girlfriend, but there is certainly a strong argument that the killing was committed in the heat of passion; and there is certainly ample ground to believe that this may not have been a premeditated murder. The majority asserts that it might have reversed if this had been a "weaker case." This *is* a "weaker case." Although there is no doubt that Jones killed his girlfriend, there are all kinds of doubts about his mental state at the time of the stabbing. Even, however, if Jones' defense were "weak," what I find to be "weak" is the majority's admonition to the prosecutors, telling them, in effect: "Look out prosecutors, because one of these days we might hold you accountable for such things as telling the jury that the defendant is a rabid animal who, unless convicted, will come back to kill jurors."

With respect to the death penalty judgment, it is very clear to me that multiple stab wounds do not, of themselves, constitute mutilation. Mutilation is intentional mayhem that goes "beyond the act of killing." Browne v. State, 113 Nev. 305, 933 P.2d 187 (1997). The majority's discussion of this aggravating factor is so superficial and incomplete that it is hardly worth responding to. Under the incomplete definition of mutilation recited in the majority any fatal gunshot to the head would be sufficient to constitute mutilation because, clearly, any such wound would "alter radically" the brain of the victim "so as to make [it] imperfect." There is insufficient evidence of mutilation as an aggravator, and this, at the very least, should have been recognized by the majority. This case calls for a new penalty hearing.