VICTOR MAXIMILLIAN JIMENEZ, APPELLANT, *v.* THE STATE OF NEVADA, RESPONDENT.

No. 24580

May 30, 1996                                          918 P.2d 687

---

*Laura Wightman FitzSimmons,* Las Vegas, for Appellant.

*Frankie Sue Del Papa,* Attorney General, Carson City; *Stewart L. Bell,* District Attorney, and *James Tufteland,* Chief Deputy District Attorney, Clark County, for Respondent.

**OPINION**

*Per Curiam:*

After a May 1987 mistrial resulting from a hung jury, appellant Victor Maximillian Jimenez's second trial in January 1988 produced convictions of first-degree murder and robbery with use of a deadly weapon, and a sentence of death. This court affirmed his convictions on appeal, but reversed his capital sentence. Jimenez v. State, 105 Nev. 337, 775 P.2d 694 (1989) (*Jimenez I*). Following a second penalty hearing, Jimenez again received a death sentence, which this court affirmed. Jimenez v. State, 106 Nev. 769, 801 P.2d 1366 (1990). Except where otherwise noted, this opinion addresses only the second trial and second penalty hearing.

In December 1991, Jimenez petitioned the district court in

proper person for post-conviction relief. Through counsel, he filed a supplemental petition in June 1992. The court denied the supplemental petition on May 12, 1993, and Jimenez appealed. Pursuant to SCR 250(IV)(H), this court referred the case back to the district court to consider certain evidence for purposes of determining whether that evidence would affect the court's denial of the petition. On December 5, 1994, after considering the evidence, the district court again denied relief.

For reasons discussed hereafter, we conclude that Jimenez's convictions are infirm and that he is entitled to a new trial.

## FACTS

### Background

Relevant to this appeal, the following evidence was presented at trial. Leandrew Domingo, an acquaintance of Jimenez, testified that he and Jimenez had been at Gabe's Bar on the evening of January 9, 1987. Jimenez and Domingo broke into a truck parked outside the bar and stole some items, including a tool box. They took the tool box to Jimenez's residence, where he obtained ten dollars for it. Among the tools that the owner of the truck reported missing were a carpet knife, two sheetrock knives, and a dagger.

The next morning the North Las Vegas Police found two bodies at Gabe's Bar, victims of multiple stab wounds. One victim was the bartender, and the other was a customer. No weapons were ever found, but an expert testified that the victims' wounds could have been inflicted by a carpet knife and a dagger. The investigation at the scene revealed bloody footprints made by tennis shoes and $330.00 missing from the bar's slot bank and jukebox.

Detective Thomas Harry of the North Las Vegas Police Department ("NLVPD") testified. On January 22, 1987, Harry received information regarding the killings, and he and Detective Bruce Scroggin picked up Jimenez and took him to the police station for questioning. Jimenez was advised of his constitutional rights, but did not invoke his right to remain silent or to have an attorney. None of Jimenez's statements was recorded. Detective Harry asked Jimenez if he or Domingo had been involved with the murders at Gabe's Bar. According to Harry, Jimenez asked what would happen to him if he was. Harry said it would depend on what had happened in the bar. Jimenez asked if he would be killed, and Harry told him he could get the death penalty or life in prison. Jimenez also asked if it would be easier on him if two people had been involved. Harry again told him it would depend.

Harry interrupted the interview and went to Jimenez's residence and obtained the stolen tool box and some of Jimenez's

clothes from Jimenez's father. A luminol test indicated blood on a pair of his pants and his jacket. The blood was later identified as human, but could not be typed. Harry testified that when he informed Jimenez that blood had been found, Jimenez said, "Okay, you have me." According to Harry, Jimenez asked the detectives if they thought more than one person had done it, and Harry said they did not know. Jimenez asked what if he told them he did it himself. Harry said to tell them, but Jimenez said he could not, that his family would be in danger. The interview ended.

Detective Scroggin testified. On January 27, 1987, Jimenez's parents spoke with their son at the police station. Scroggin escorted Jimenez back to his cell immediately after his visit with his parents. Jimenez was subdued and appeared sad. When the two were alone in an elevator, Jimenez hung his head and cried. Scroggin testified that when he asked what was wrong, Jimenez said it just felt better to tell someone.

Billy Ray Thomas testified. Thomas had been incarcerated in the North Las Vegas jail and shared a cell with Jimenez and several other inmates on January 28, 1987. That evening, Jimenez was talking on a telephone which had been brought to the cell. Thomas wanted to use the phone and sat down near Jimenez to await his turn. Thomas testified that Jimenez turned his body away from Thomas, covered his mouth with his hand, and said, "They got me, dad. I stabbed the guy."

In January 1988, Jimenez was convicted of murder and robbery with use of a deadly weapon and sentenced to death. Upon remand from this court, a second penalty hearing was held in November 1989, and he was again sentenced to death.

Jimenez filed a supplemental petition for post-conviction relief in June 1992. The district court allowed an evidentiary hearing only in regard to Jimenez's claim that the State failed to inform him of exculpatory evidence prior to trial. The court denied the petition in May 1993, and Jimenez appealed. Pursuant to SCR 250(IV)(H), this court referred the case back to the district court for a second hearing to allow the court to consider evidence relating to the credibility of a witness against Jimenez and to determine whether this evidence would affect its denial of the petition. On December 5, 1994, the district court found that the evidence was unrelated to Jimenez's case and again denied relief.

*Exculpatory Evidence*

At the trial, defense counsel asked Detective Harry on cross-examination if he had any other suspects before he arrested Jimenez on January 22, 1987. Harry said no. However, Harry

and Detective Scroggin admitted to receiving information on two possible suspects. The detectives did not pursue this lead very far and dropped it completely when they got a tip regarding Jimenez. Sharon Bromley had provided the information regarding the two suspects. When defense counsel called her as a witness, the State successfully interposed hearsay objections to counsel's attempts to question her regarding the two possible suspects.

The following evidence was presented to the district court at the first post-conviction evidentiary hearing in April 1993. Mel Harmon, the prosecutor at the trial, testified that his file had been open to defense counsel and that all police reports should have been in his file prior to trial. When shown police reports obtained by Jimenez's post-conviction counsel several years after the trial, Harmon was not familiar with them but stated that even if he had had this information, he would not have felt a duty to disclose it to the defense. The information in question included indications that a day or two after the murders, a man by the name of John Johnson overheard two men talking about killing two people at a bar and saw one of the men display a knife. Johnson later made a photo identification of one of the men. Johnson shared this information with Sharon Bromley, who thereafter informed Detectives Harry and Scroggin. The information in the police reports also included the fact that a knife was found in a toilet at Gabe's Bar on February 6, 1987, less than a month after the murders, and that a man who had reportedly threatened the bartender at Gabe's Bar a few days before the murders then allegedly returned and killed the two victims.

John Johnson also testified at the hearing. He testified that a day or two after the murders, Sharon Bromley told him about the murders and asked him to let her know if he heard anything about them. Bromley worked for the Las Vegas Metropolitan Police Department (LVMPD) in gun detail and knew one of the victims. Johnson was an apartment manager in public housing at the time. The same night after talking to Bromley, Johnson overheard two Hispanic men at the Jack Daniels Bar speaking in mixed English and Spanish. (The Jack Daniels Bar is about eight blocks from Gabe's Bar.) Johnson understood very little Spanish, but heard them speak of the killing of a bartender. One of them said "something to the effect, I wish I would have made sure the other one was down or dead," and produced a long-bladed knife with what appeared to be a bone-inlaid handle. Johnson revealed this information to Bromley, who brought him photos from which he identified one of the men he had overheard. No one in law enforcement or from Jimenez's defense team ever contacted Johnson. He would have willingly testified at Jimenez's trial if he had

been asked. Johnson did not know the context of the conversation he overheard. When Jimenez's post-conviction counsel offered an exhibit to support Johnson's credibility, the State's attorney said, "I'm not questioning the sincerity . . . and good faith of this witness."

Sharon Bromley testified that after she learned of the murders, she contacted Johnson because of his street knowledge. After he told her what he had heard and seen, she contacted Detective Harry. Harry provided her with photographs of two Hispanic men arrested for robbery three days after the murders. She later showed the photos to Johnson, who identified one as one of the two men he had overheard. (These men came to be referred to as "the two Cubans.") Bromley called Harry to give him the information provided by Johnson. Harry told her he had things under control, and she never heard again from those who were investigating the two murders. Jimenez's trial counsel contacted Bromley and called her as a witness at the trial.

Former Detective Harry, who had retired from the police department, testified at the hearing. He vaguely remembered receiving information from Bromley, but said he would not have given her any photos. He recalled very little regarding an investigation of the two Cubans, arrested for robbery three days after the murders at Gabe's Bar, as suspects in those crimes. He testified at the first trial that he went to the Las Vegas jail and examined their clothes and tennis shoes and had their knife checked at the crime lab. However, the police file on the case uncharacteristically contained no report of this investigative activity or request to the crime lab.

Detective Al Adams testified that he completed two reports concerning the murder investigation which he gave to Detectives Harry and Scroggin. The first report, prepared two days after the murders, indicated that a reliable informant had heard two Hispanic males talking in the Jack Daniels Bar about the murder of a bartender, and that one of them had a bone-handled knife. The second report, prepared five days after the murders, recorded the fact that two Hispanic men who had a bone-handled knife had been arrested for a robbery. The second report also indicated that Adams had requested photographs and fingerprints of the two men, and the testing of the knife.

Arnold Weinstock, Jimenez's trial counsel, testified that he had reviewed the State's file before trial. The only material he had seen in the file concerning Sharon Bromley's information consisted of two pages indicating that a confidential informant had told her about two Hispanic males discussing the killing of a bartender. He never saw other materials regarding the arrest of the two Cubans for a robbery, their photos, the confiscation of

their knife, the finding of a knife in the toilet of Gabe's Bar, and the report that another man threatened the bartender and later killed the two men at Gabe's Bar. Weinstock had contacted Bromley, but she would not reveal the identity of the informant. As previously noted, when he called Bromley as a witness, he was unable to elicit her testimony regarding Johnson's knowledge due to successful hearsay objections by the prosecutor.

*Evidence Regarding the State's Informant Witness*

Billy Ray Thomas testified for the State at trial. Thomas shared a jail cell with Jimenez in late January 1987 and testified to admissions made by Jimenez. The crucial testimony indicated that he overheard Jimenez say on the telephone, "They got me, dad. I stabbed the guy." Thomas stated that the next day he was taken from the cell without explanation. Detectives questioned him, and he told them about Jimenez's remarks. Thomas stated that he had been in jail three or four times prior to January 1987. The day after he told the police about Jimenez's remarks, Thomas, who was incarcerated on a felony drug charge, was released on his own recognizance. The charge was eventually dropped. When asked if he gave police information in any other cases, Thomas said no. He said that in this case, he revealed the information simply because he was asked and he felt it was something he had to do. Thomas maintained that he was promised nothing and received no benefits from talking to the police.

Detective Scroggin testified at trial that he had taken Thomas's statement. When asked if he promised or provided Thomas any benefits for informing on Jimenez, Scroggin said no. The following exchange then took place on cross-examination.

> Q When did you first meet up with Billy Thomas?
> A Billy Thomas is one of those types that gets arrested from time to time and I don't know if I have ever arrested Billy Thomas, but you might be able to run a check somewhere seven or eight years ago and see that yes, I did arrest him or have—had knowledge of him.
> Q You were pretty familiar with Billy Thomas weren't you?
> A It's a name that is familiar with North Las Vegas police officers.
> Q And, again, we're talking prior to January 28th, 1987, you were familiar with Billy, right?
> A Yes, I'd heard the name, was familiar with him.
> Q Has Billy ever provided you with any information on any other cases?
> A Me, no.

Q Do you know of him providing other officers with information?

A I have no personal knowledge of him giving any other officers information.

Scroggin further testified that a corrections officer told him that he should interview Thomas because Thomas had overheard something that might help in his investigation. Scroggin said he did not know what Thomas had been in jail for or that Thomas had been released the day after the interview. Scroggin said, "it was none of my doing."

At the first post-conviction hearing, Scroggin's testimony was appreciably different. He first met Thomas at the jail in January 1987, while investigating this case. Scroggin stated:

I did nothing with the charges he was in on at the time he was in custody, and told him I would not help him with anything he was in for. And he didn't ask for any help. I helped him later on in other charges that he was booked for after all this was done.

Post-conviction counsel asked, "So you helped him after on in other charges because he was helping in Jimenez?" Scroggin answered, "Yes. And he was still supplying me with information. . . . in other areas—cases." Scroggin testified that he had a charge against Thomas dropped in April 1987. (Scroggin's trial testimony that Thomas had never provided him with other information was given in January 1988.) He had another charge against Thomas dismissed sometime in 1988. Scroggin did not know if he ever told Harmon, the prosecutor, that Thomas was an active police informant.

## DISCUSSION

I. *The State's failure to provide the defense with exculpatory evidence.*

Jimenez argues that the State violated its constitutional duty to inform him of exculpatory evidence it possessed. The State contends that Jimenez's trial counsel knew of some of this evidence and that the evidence was not material. "It is a violation of due process for the prosecutor to withhold exculpatory evidence, and his motive for doing so is immaterial." Wallace v. State, 88 Nev. 549, 551-52, 501 P.2d 1036, 1037 (1972) (citing Brady v. Maryland, 373 U.S. 83 (1963)). The prosecutor represents the state and has a duty to see that justice is done in a criminal prosecution. *Id.* at 552, 501 P.2d at 1037.

"A prosecutor must disclose evidence favorable to an accused when that evidence is material either to guilt or to punishment." Roberts v. State, 110 Nev. 1121, 1127, 881 P.2d 1, 5 (1994). The standard for determining the materiality of withheld evidence varies. In cases where the defense makes no request or a general request for evidence, " 'if the omitted evidence *creates a reasonable doubt which did not otherwise exist,* constitutional error has been committed.' " *Id.* at 1128, 881 P.2d at 5 (quoting United States v. Agurs, 427 U.S. 97, 112 (1976)) (emphasis added in *Roberts*). Under this standard, evidence is material if there is a reasonable probability that the result would have been different if the evidence had been disclosed. *Id.* A reasonable probability is one sufficient to undermine confidence in the outcome. *Id.*

In federal cases, this is now the standard for requests for specific evidence as well. *Id.* at 1128-29, 881 P.2d at 5. However, in Nevada and a number of other states a *Brady* violation occurring after a specific request is material if "there exists a reasonable *possibility* that the claimed evidence would have affected the judgment of the trier of fact, and thus the outcome of the trial." *Id.* at 1132, 881 P.2d at 8 (emphasis added).

In this case, the district court directed that full discovery take place pursuant to trial counsel's request. It does not appear that Jimenez made a specific request before trial in regard to the evidence now at issue, but given the fact that full discovery had been ordered by the trial court, defense counsel had no reason to anticipate that other reports existed that were not made available. Moreover, it is relevant that defense counsel attempted to examine witnesses in regard to some of this evidence but was thwarted by the prosecutor's objections. We conclude that the combination of these factors amounted to the functional equivalent of a specific request for the information from the State.

In its order denying post-conviction relief, the district court concluded that "the other suspect information should have been provided to the defense," but was "nevertheless confident that no *Brady v. Maryland* violation occurred." It found that the failure to provide the information was inadvertent, not intentional. The order discussed only the conversation overheard by Johnson. The court noted that the conversation was in both Spanish and English and that Johnson had no knowledge of its actual context. The court believed that the conversation did not constitute statements against penal interest and would have been excluded as hearsay. Finally, even if the remarks were admissible, it found no "reasonable likelihood that their introduction would have changed the outcome" of the trial.

There are two major problems with the district court's analysis of the *Brady* issue. First, it did not deal with the full range of withheld evidence. Besides the overheard conversation, there was the arrest of two men with a knife for a robbery, Johnson's identification of one of the arrested men as one of the men he had overheard, the report that another man had threatened one of the victims and later killed them, and the finding of a knife in a toilet at Gabe's Bar. Second, the assumed inadmissibility of the overheard remarks is irrelevant to the issue of whether the State should have informed the defense of the evidence. Discovery in a criminal case is not limited to investigative leads or reports that are admissible in evidence. The issue is whether the State had a duty to inform the defense of this potentially exculpatory evidence, thereafter leaving to the defense problems concerning the extent to which the evidence could be used or expanded upon both before and during trial. Furthermore, much of the evidence disregarded by the court had no hearsay complications.

The district court also concluded that the failure to divulge the information was inadvertent, but Jimenez points to evidence suggesting that it was withheld intentionally. We need not address this issue because the prosecutor's motive or reason for withholding exculpatory evidence is immaterial. Wallace v. State, 88 Nev. 549, 551-52, 501 P.2d 1036, 1037 (1972). Moreover, even if the detectives withheld their reports without the prosecutor's knowledge, "the state attorney is charged with constructive knowledge and possession of evidence withheld by other state agents, such as law enforcement officers." Gorham v. State, 597 So. 2d 782, 784 (Fla. 1992); *cf.* United States v. Butler, 567 F.2d 885, 891 (9th Cir. 1978).

The dispositive issue before us concerns the materiality of the withheld evidence. After careful consideration, we conclude that the exculpatory evidence at issue was material, even under the stricter standard requiring a showing of reasonable probability that the result would have been different. We reach this conclusion because the evidence against Jimenez was circumstantial and the credibility of the informant who testified to Jimenez's most damning admission was impeachable. Unfortunately, however, as hereinafter discussed, the evidence relevant to the informant's impeachment was also withheld from the defense. There is therefore a reasonable probability that the result would have been different had this information regarding other possible suspects[1] been revealed.

---

[1]The undisclosed evidence was also relevant under *Brady* to the extent that the defense could have used it to challenge the methods and reliability of the police investigation. Kyles v. Whitley, ...... U.S. ......, ...... n.13, ......, 115 S. Ct. 1555, 1569 n.13, 1571-72 (1995).

## II. The State's failure to provide the defense with impeachment evidence against the State's informant witness.

Jimenez contends that the State did not divulge evidence relevant to impeachment of its informant witness and that its witnesses lied under oath when questioned about that issue. The State maintains that its informant received no benefits for helping the State in this case, regardless of benefits he received in other instances, and therefore the defense had no right to such information.

"It is well settled that evidence that would enable effective cross-examination and impeachment may be material and that nondisclosure of such evidence may deprive an accused of a fair trial." *Roberts,* 110 Nev. at 1132-33, 881 P.2d at 8. This is simply another aspect of the application of *Brady* and its progeny. *See id.*

In *Roberts,* the defendant claimed that he had been entrapped by a confidential informant ("CI") and that the police had not prosecuted the informant because of his work for them. The prosecution refused to disclose its entire file on the CI despite the defendant's discovery request. This court concluded that "if evidence substantiating Roberts' entrapment claim and allowing effective impeachment of [the CI] is contained in the CI file, and if Roberts was denied access to that information, then he was deprived of a fair opportunity to present his only legitimate defense, and that he was therefore not afforded a fair trial." *Id.* at 1134, 881 P.2d at 9.

In this case, the State argued to the district court that it had no duty to disclose to the defense the fact that its informant, Thomas, had received benefits from the State because the State and Thomas had not worked out a "specific bargain" for Thomas's testimony against Jimenez. The district court accepted the State's position both factually and legally, finding that "the action by Detective Scroggin in April 1987 was not the product of any bargain for the testimony of Billy Ray Thomas" and concluding that "Jimenez was afforded all the procedural safeguards to which he is entitled."

There are two problems with the position taken by the State and the district court. First, it ignores the fact that the trial testimony of the informant and of the detective was at best inaccurate and at worst perjury. Even if the State had no duty to disclose "unrelated" benefits given to Thomas, its witnesses had a duty to testify truthfully in response to defense questions regarding such benefits. Detective Scroggin, however, had at the very least an extreme lapse of memory when he testified in January 1988 that

he hardly knew Thomas and knew of no other cases where Thomas had provided police with information. In actuality, just nine months before his trial testimony, Scroggin dropped a charge against Thomas for help Thomas gave him in the instant case and other cases. Thomas's testimony was similarly false. It is also notable that by dropping the charge in April 1987, the month before Jimenez's first trial, the State paved the way for Thomas to testify at the first trial as a free man, rather than a jail inmate charged with a drug offense.

If the prosecution uses perjured testimony which it knew or should have known was perjurious, a conviction obtained by such testimony is "fundamentally unfair" and "must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." United States v. Agurs, 427 U.S. 97, 103 (1976). The district court did not even address this troubling issue.

Second, the prosecution's duty to disclose exculpatory or impeachment evidence is not limited to situations where the State admits that it made a deal with an informant specific to the case at hand. Although Scroggin admitted that he gave benefits to Thomas in return for Thomas's testimony against Jimenez, he and the State maintain that at the time that Thomas agreed to testify, Thomas had not been promised or provided any benefits in exchange for his cooperation in this case. Therefore, the State insisted and the district court concluded that Jimenez had no right to know about any benefits given to Thomas. However, despite the plausibility of the State's assertion that Thomas testified without any expectation that it would benefit him, the State had a duty to disclose the facts in question.

In United States v. Shaffer, 789 F.2d 682, 688 (9th Cir. 1986), the appellant alleged that the government never disclosed that the informant who testified against him was a paid informant in a separate drug case and never disclosed the full promises and benefits given to the informant. The government contended that "because there was no explicit agreement on this matter, it had nothing to disclose." Id. at 690. The court held: "While it is clear that an explicit agreement would have to be disclosed because of its effect on [the informant's] credibility, it is equally clear that facts which imply an agreement would also bear on [his] credibility and would have to be disclosed." Id. The Supreme Court held that where the credibility of a witness is an important issue in the case, "evidence of *any understanding* or agreement as to a future prosecution would be relevant to his credibility and the jury was entitled to know of it." Giglio v. United States, 405 U.S. 150, 155 (1972) (emphasis added); *see also* Haber v. Wainwright, 756 F.2d 1520, 1524 (9th Cir. 1985).

Even if the prosecutor was unaware of Thomas's history as a police informant and the benefits he had received, any failure to disclose material evidence would be reviewable for prejudice to the defendant. Moreover, when the police do not reveal a witness's informant status to the prosecutor, "the state attorney is charged with constructive knowledge and possession of evidence withheld by other state agents, such as law enforcement officers." Gorham v. State, 597 So. 2d 782, 784 (Fla. 1992); cf. United States v. Butler, 567 F.2d 885, 891 (9th Cir. 1978).

We are still called upon to determine whether the withheld evidence was material. During examination of Detective Scroggin (as well as Thomas), Jimenez's trial counsel specifically requested the information regarding Thomas's informant status and any benefits he had received. Therefore, the standard of materiality is whether "there exists a reasonable possibility that the claimed evidence would have affected the judgment of the trier of fact, and thus the outcome of the trial." *Roberts,* 110 Nev. at 1132, 881 P.2d at 8.

We conclude that there is such a reasonable possibility in this case. Thomas's testimony provided the most damning evidence against Jimenez in a case otherwise dependent upon circumstantial evidence. Thomas testified to the only explicitly incriminating admission by Jimenez. In *Jimenez I,* this court culminated its recitation of the facts with that admission and, in assessing the sufficiency of the evidence, stated that Jimenez ignored "the circumstantial evidence against him and, most notably, his own incriminating statements." *Jimenez I,* 105 Nev. at 342, 775 P.2d at 697. Thomas's testimony was central to the case, and therefore the jury's assessment of his credibility was important to the outcome of the trial. *Cf. Shaffer,* 789 F.2d at 688-89; *Gorham,* 597 So. 2d at 784-85. Furthermore, the undisclosed exculpatory evidence regarding other investigative leads must also be considered because the materiality of withheld evidence is judged collectively, not item by item. Kyles v. Whitley, ...... U.S. ......, ......, 115 S. Ct. 1555, 1567-69 (1995).

III. *The jury instructions regarding the finding of mitigating circumstances.*

Given our disposition of the above issues, we need not address Jimenez's other assignments of error. However, we will address one penalty phase issue in order to eliminate uncertainty on the matter in the event Jimenez is again faced with a jury deliberating the issue of death-worthiness. Jimenez contends that the penalty phase instructions were unconstitutional because a reasonable juror would have interpreted the instructions as a whole to require

a unanimous finding of any mitigating circumstances. We disagree.

In a capital case, a sentencer may not be precluded from considering any relevant mitigating evidence. Mills v. Maryland, 486 U.S. 367, 374-75 (1988). This rule is violated if a jury believes that it cannot give mitigating evidence any effect unless it unanimously agrees that the mitigating circumstance exists. *Id.* at 375. The question here is whether the jury, acting reasonably, could have interpreted the instructions and verdict form in this proscribed manner. *Id.* at 375-76.

In this case, the penalty instructions did not explicitly state that a single juror could find and give effect to mitigating evidence. However, we conclude from the totality of the instructions that reasonable jurors would have interpreted the instructions to allow any of them to place whatever weight they deemed proper concerning any proffered evidence of mitigating circumstances. In the end, each juror must have evaluated the juxtaposition of aggravating circumstances and mitigating circumstances in reaching the conclusion that the latter were not sufficient to outweigh the former. This weighing or evaluative process by the individual jurors must result in a unanimous verdict. There was no instruction indicating the need for unanimity regarding evidence in mitigation, and of course the State did not make the mistake of suggesting a requirement of such unanimity. Moreover, the jury was instructed that each aggravating circumstance had to be unanimously found by evidence beyond a reasonable doubt, conditions that were not attached to findings of mitigating circumstances. Indeed, the jury was instructed that it could consider specified mitigating circumstances and "[a]ny other mitigating circumstances." There was no constraint on the right of individual jurors to find mitigators, such as a requirement of unanimity or proof by a preponderance of the evidence or any other standard.

Nevada's statutory scheme and practice is entirely different from that described in Mills v. State, 527 A.2d 3, 14-20 (Md. 1987). In *Mills,* the Maryland Supreme Court made clear the requirement then existing under Maryland law that juries must find mitigating circumstances by unanimous vote. Hence, the petitioner in *Mills v. Maryland* took the position that "a jury that does not unanimously agree on the existence of any mitigating circumstance may not give mitigating evidence any effect whatsoever, and must impose the sentence of death." *Mills v. Maryland,* 486 U.S. at 375. The United States Supreme Court thus had cause for concern that under the Maryland instructions requiring jury unanimity in finding mitigating circumstances, the death sentence

might result because individual jurors could not factor into the penalty determination their own conclusions regarding the existence of mitigating circumstances. Such is not the law in Nevada, and there was no basis in the instructions for jurors to believe that their own individual views on the existence and nature of mitigating circumstances could not be applied by each of them in weighing the balance between aggravating circumstances and mitigating circumstances. Unanimity is required only in the verdict concerning the presence of aggravating circumstances and the fact that the mitigating circumstances, *whatever they are,* are not sufficient to outweigh the aggravating circumstances. We therefore conclude that there is no basis for determining that the jury, acting reasonably, could have believed that mitigating evidence could not be considered in its deliberations unless unanimously found to exist.[2]

### CONCLUSION

We conclude that Jimenez's petition for post-conviction relief should be granted because the State violated its constitutional duty to inform Jimenez of material exculpatory evidence it possessed and of material evidence relevant to impeachment of its informant witness. Accordingly, we reverse the district court's order denying Jimenez's petition, and remand this case to the district court with directions to vacate Jimenez's judgment of conviction and sentences and to provide Jimenez with a new trial.[3]

[2]We also note that, contrary to the statutory scheme in Maryland as described in *Mills v. Maryland,* Nevada juries are free to impose a penalty less than death despite a finding by the jury that the mitigating circumstances do not outweigh the aggravating circumstances.

[3]THE HONORABLE ROBERT E. ROSE voluntarily recused himself from participation in the decision of this appeal.