OPINION
 

 Per Curiam:
 

 Appellant Kevin Lamar Lay contends that the State violated Brady v. Maryland, 373 U.S. 83 (1963), by not providing him with two instances of exculpatory information.
 
 [1]
 
 One involved prior inconsistent statements by a key witness for the prosecution. The other involved statements by three witnesses that a second person had fired shots at the scene of the murder of which Lay was convicted.
 

 FACTS
 

 After a jury trial, Lay was convicted of first-degree murder with the use of a deadly weapon. The State sought the death penalty, but the jury fixed the penalty at life without possibility of parole. The district court sentenced Lay to two consecutive life terms without possibility of parole. This court affirmed Lay’s conviction. Lay v. State, 110 Nev. 1189, 886 P.2d 448 (1994).
 

 The State had originally filed a twenty-two count indictment against Lay, charging him and two codefendants with the murder of Richard Carter and several unrelated crimes including attempted murder, assault with a deadly weapon, battery with a deadly weapon, trafficking and possession of a controlled substance, grand larceny, robbery, aiming a firearm at a human being, intimidating a witness to influence testimony, and racketeering. The racketeering counts were based on alleged illegal gang activity. Lay was a member and leader of the Piru Bloods, a Las Vegas gang. The racketeering counts were dismissed for lack of adequate evidence at the grand jury proceeding. The murder count was severed from the indictment, and Lay was tried on that count apart from his codefendants.
 

 
 *1188
 

 The trial
 

 The State presented evidence that around 11:30 p.m. on June 4, 1990, Lay drove a stolen white Oldsmobile Cutlass into the' parking lot of the AM-PM market at the comer of Martin Luther King Drive and Carey Avenue in North Las Vegas and shot a gun from the car window, killing Carter.
 

 James Haines testified that as he approached the AM-PM that night he heard two different kinds of gunshots. As he got closer he saw fire coming from the front passenger window of a car, which then drove away. Although he knew Lay, Haines did not see who was driving the car.
 

 Dewain Norwood testified that he was in his car at the AM-PM when a car pulled up. Two people in the car shot a rifle and a pistol at about three people in the parking lot. Norwood did not see who was shooting. The driver fired the rifle out the passenger’s side window, and a person in the back seat fired the pistol out the window. The driver later stepped out of the car and shot again.
 

 Gregory Haynes testified that he was a friend of the victim, Carter, and was inside the AM-PM store when the shooting started. He went outside, and Carter had been shot. Haynes identified Lay as the shooter. Lay was shooting out the driver’s window of a car. Haynes identified the weapon as a semiautomatic .223 rifle. It was possible that other weapons had been used, but Haynes heard no other weapons and saw no one else in the car. Haynes did not know Lay to be a member of a gang and denied being in a gang himself. Haynes admitted that after the shooting he had told police that he did not know the shooter and could not describe his face.
 

 Cedric Stewart testified that he was with Carter when the shooting occurred. Stewart said he was formerly affiliated with a Crip gang, the Gerson Park Kingsmen, and Carter had been a member. Lay was a leader of a rival gang, the Piru Bloods. On the night in question, Stewart was speaking to Carter in the AM-PM parking lot when shots came from a car. Lay was in the driver’s seat of the car and fired what Stewart thought was a rifle out the passenger’s side window. Stewart admitted that after the shooting he had told police that he did not know who had shot Carter.
 

 Kevin Page testified that he was driving toward the AM-PM on the night of the shooting, heard shots, and saw Lay driving a car from the AM-PM parking lot. He saw a second person in the back seat of Lay’s car. At the time of the shooting, Page was a friend of Carter and a member of the Gerson Park Kingsmen, who do not like the Bloods. Page’s former girlfriend had become Lay’s girlfriend. Page waited a year before telling anyone from law enforcement that he had knowledge of the crime.
 

 
 *1189
 
 Robin Giddens testified that she was the paramedic who treated the victim after he was shot. A man at the scene (the victim’s brother she later learned) was panicked and threatened Giddens. Giddens found the victim in shock and in extremely critical condition. He “was going down hill” as Giddens tended to him. The victim answered her questions and talked with his brother. The victim whispered to his brother, “ ‘K-Lay shot me man, he shot me.’ ” (K-Lay was Lay’s nickname.) Giddens did not put this in her paramedic report because “it’s part of the code I guess of working in gang related situations and in possibly dangerous situations that things aren’t written down.” On cross-examination, Giddens admitted that, other than her partner, she could not remember the name of the victim, his brother, fire department personnel, or any person at the crime scene that night except K-Lay.
 

 Giles Green, M.D., performed the autopsy of Carter’s body. Carter was killed by a gunshot wound that damaged his liver and vena cava. The bullet had passed through the body, but Green concluded from the nature of the wound that the likely weapon was a high-velocity small-caliber rifle. A police identification technician found two projectiles and three shell casings at the crime scene. The casings were .380 caliber, used in a semiautomatic handgun. Inside the recovered stolen car, he found a .303 caliber shell casing, used in a rifle.
 

 Shawn Turner testified that on the night in question he was at his mother’s house, which was across the street from Lay’s house. Sometime between 11:00 and 11:30 p.m. he saw four or five men on foot, including Lay, run up the street and go into the backyard of Lay’s house. When the men first arrived, Lay held a handgun and the others carried shotguns or rifles. After about ten minutes, the men left on foot; then fifteen or twenty minutes later, they returned by car. The AM-PM was less than a five-minute drive from Lay’s house. Turner’s brother, Lawrence Daniels, testified similarly, but Daniels testified that Lay held a rifle or shotgun and that he saw no other weapons.
 

 The car from which the fatal shots were fired was reported stolen around 11:00 p.m. that night. After the car was recovered, Lay’s fingerprints were found on the passenger door.
 

 Anthony Dimauro, an officer with the North Las Vegas Police Department, testified for the defense. He was one of the first officers at the crime scene and spoke to the victim, Carter, before the paramedics arrived. Carter appeared to be in too much pain to carry on a conversation. When Dimauro asked him who had shot him, Carter said that he did not know. Carter described neither the vehicle nor the shooter.
 

 
 *1190
 

 The evidentiary hearing
 

 After Lay petitioned for habeas relief, the district court held an evidentiary hearing in 1997 at which the following evidence was presented.
 

 Rita Brookins, a Clark County Deputy District Attorney, testified. Brookins was a law clerk with the Clark County DA in 1992 when she “pretrialed” witnesses for Lay’s murder trial,
 
 i.e.,
 
 questioned them to determine what their testimony would be. She worked for Robert Lucherini, the head of the gang unit in charge of prosecuting Lay. Brookins pretrialed Robin Giddens, the paramedic that treated Carter in the parking lot of the AM-PM after he was shot. Brookins interviewed Giddens several times, and Giddens consistently told her that the victim had made no dying declaration. Giddens told her “that the victim could not speak, that he did not say anything to her, that he had a tube down his throat, and that there was so much going on it was a chaotic scene that she didn’t have the time to ask him anything.”
 

 Brookins last interviewed Giddens a day or so before Giddens was to testify at the trial. Lucherini then called Giddens into his office and shut the door. Lucherini had not done this with any other witness in the case. About 15 or 20 minutes later, Lucherini brought Brookins into his office because Giddens had recalled something. Giddens then told her that “K-Lay did it.” Brookins was “amazed” and “surprised.” In response to that surprise, “Rob [Lucherini] said, no, really. He said, I said to her do you remember him saying anything. And she goes, well, like what? And he said, well, you know, did you hear anything like E-Lay or M-Lay and she said, Oh, yeah, K-Lay. K-Lay did it.” Brookins was “shocked” and “felt suspicious.”
 

 When Brookins asked Lucherini if he was going to inform the defense about the victim’s dying declaration, he said that he did not have to because the case stemmed from grand jury proceedings, which were private. Lay’s counsel asked Brookins:
 

 Q. Did you ever ask Mr. Lucherini whether or not the defense should be notified that Miss Giddens had previously stated on three to five occasions the victim couldn’t speak because he [had] tubes down his throat?
 

 A. Well, the defense already had that information because I had had to prepare a document, and I believe it was already filed with the court, and it already listed the witnesses and a summary of their testimony.
 

 Q. And is it your testimony that you prepared something saying that Miss Giddens had said previously that she [sic] could not speak because people—
 

 A. You know, I don’t remember specifically. I haven’t
 
 *1191
 
 seen the document in five years, I don’t remember specifically. But whatever she had said to me and what her testimony was going to be would have been in that document.
 

 Based on interviews with jurors after the trial, Brookins thought it was fair to characterize the paramedic’s testimony as “devastating” to Lay.
 

 In other pretrial interviews, three witnesses told Brookins that “Spike was in the car in the back seat shooting out the window also.” Brookins gave this information to Lucherini. He did not provide it to the defense, saying that “Spike had already been ruled out as a suspect.”
 

 Brookins went to Drew Christensen with her concerns about the statements regarding another shooter and Giddens’s inconsistent statements. (Christensen prosecuted Lay’s trial with Lucherini.) After the trial, she and Christensen went to see Lay’s trial counsel, David Schieck, and told him about this information. Schieck had been unaware of it until then.
 

 A number of witnesses at the evidentiary hearing testified that discovery had been very limited in this case. Unlike its usual policy, the DA’s office did not open its file to the defense. The district court had to rule on various defense motions seeking discovery. The prosecution was required to provide only what was mandated by statute because the case involved a gang dispute and the prosecution was concerned about the safety of witnesses. The defense did subpoena police records.
 

 Schieck testified. When paramedic Giddens testified at trial, Schieck and co-counsel Lizzie Hatcher expected only foundational testimony as to the crime scene and the condition of the victim. They had never been informed that she would testify that the victim made a dying declaration identifying Lay as his killer. Nor had they been informed of Giddens’s prior inconsistent statements that the dying man had said nothing. Schieck and Hatcher tried not to indicate to the jury how damaging they felt Giddens’s testimony was. Schieck did not learn about the prior inconsistent statements or the witnesses’ identification of another shooter until Christensen and Brookins visited him after the trial and informed him that the information had been withheld.
 

 Hatcher, Schieck’s co-counsel, also testified that the defense never received any information that Giddens knew of a dying declaration or had made prior inconsistent statements. Nor was the defense given information about a shooter named Spike.
 

 Christensen, who prosecuted the case with Lucherini, testified. Lay’s prosecution was unusual because it was brought by indictment and there was no .open file. Christensen “could tell the frustration the defense had at trial” because “they were handcuffed
 
 *1192
 
 in that much of the evidence they saw at trial I think was probably the first time they saw it.’ ’
 

 The State called paramedic Giddens to testify. She recounted her experience at the crime scene on the night of the shooting, recalling that “the patient told the other guy that um, that K-Lay shot him was what he said.” That night, Giddens spoke with her partner about whether she should document the victim’s statement. He was against doing so, and the general practice was not to because if paramedics report such matters they could be in danger from people in the field who might equate them with the police. Her husband felt the same way.
 

 Giddens did not think about it again until she was called into Lucherini’s office before the trial. Lucherini asked her if she had heard of certain names, including Kevin Lamar Lay. She said no.
 

 And then he asked me about Pele, if I had ever heard the name Pele.
 

 Well, I knew it was a soccer player or something like that from Canada but that’s when it kind of flashed back to the scene and that’s when I remembered what the guy had said, I remember him calling him K-Lay.
 

 Giddens admitted on cross-examination that she probably told Brookins that she did not remember any statement by the victim because she had “spaced it, put it aside.” She admitted that she had never been involved in another case with a dying declaration. Though the case was unusual, “one of the aspects of emergency care is putting it behind you.” When asked why she decided to testify in a capital murder trial after she initially declined to even mention the incident in her report, she responded, “as I thought about it I came to the conclusion it was something I had to do.”
 

 Lucherini testified. When he interviewed Giddens, he suspected that she might know more than she had previously revealed. He did not say “K-Lay” to Giddens until she had said it. He did not remember specifically what jogged her memory, but “there was a name association done.’ ’ Asked if he could have said the name Pele to her, Lucherini said it was possible. He did not ask Giddens why she had previously told Brookins that the victim could not and did not say anything. When cross-examined as to why he did not inform the defense of the dying declaration, Lucherini responded, “The defense had the ability to interview any of these witnesses.”
 

 Lucherini remembered someone called Spike being associated with the shooting. Lucherini was aware that there might have been another person or two in the car with Lay during the shooting,
 
 *1193
 
 but he felt he could legitimately identify only Lay to the jury. Asked on cross-examination why he did not inform the defense that three witnesses had reported that Spike had been identified as a shooter, Lucherini said that the prosecution had received a lot of information in the case, much of it unreliable and unsupported, and that the witnesses had given inconsistent statements.
 

 The district court’s order
 

 The district court took the matter under submission in September 1997. Ruling from the bench in April 1999, it denied the habeas petition and asked the State to prepare a written order. The order was entered June 4, 1999.
 

 The written order concluded: “There is no evidence that the State failed to disclose exculpatory evidence.” The evidence that Spike was a shooter was neither exculpatory nor material. Lucherini had “ruled out” Spike because “such information was not reliable.” There was “no discovery” regarding Spike to be turned over and “no indication that any reports or investigations were not turned over.” As an aider and abettor, Lay would have been found guilty even if there was another shooter in the car.
 

 Regarding the failure to inform the defense that witnesses had made prior inconsistent statements, the district court stated that the state supreme court already concluded on direct appeal that a prosecutor need not disclose such evidence to a grand jury because it does not explain away the charge; “thus the doctrine of the law of the case controls.” Although the court was not sure why paramedic Giddens recanted her prior statements when she did, “there was nothing that was adduced or offered that indicates that [her] testimony . . . was coerced or perjured.” Also, the defense was aware that Giddens had previously denied that the victim said anything. Though discovery had been limited, the defense had received pertinent police reports and “was not handicapped based on defense counsel’s admissions that they had received all the information.”
 

 The order also rejected Lay’s claims of ineffective assistance of counsel.
 

 DISCUSSION
 

 Standard of review and applicable law
 

 Determining whether the State adequately disclosed information under Brady v. Maryland, 373 U.S. 83 (1963), involves both tactual and legal questions and requires de novo review by this court.
 
 See
 
 Mazzan v. Warden, 116 Nev. 48, 66, 993 P.2d 25, 36 (2000).
 

 
 *1194
 

 Brady
 
 and its progeny require a prosecutor to disclose evidence favorable to the defense if the evidence is material either to guilt or to punishment.
 
 See
 
 Jimenez v. State, 112 Nev. 610, 618-19, 918 P.2d 687, 692 (1996). Failure to do so violates due process regardless of the prosecutor’s motive.
 
 Id.
 
 at 618, 918 P.2d at 692. Evidence is material if there is a reasonable probability that the result would have been different if the evidence had been disclosed.
 
 Id.
 
 at 619, 918 P.2d at 692. In Nevada, after a specific request for evidence, omitted evidence is material if there is a reasonable possibility it would have affected the outcome.
 
 Id.
 

 Materiality “does not require demonstration by a preponderance” that disclosure of the evidence would have resulted in acquittal. Kyles v. Whitley, 514 U.S. 419 , 434 (1995). Nor is it a sufficiency of the evidence test; a defendant need not show that “after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict.”
 
 Id.
 
 at 434-35. A reasonable probability is shown when the nondisclosure undermines confidence in the outcome of the trial.
 
 Id.
 
 at 434.
 

 “[T]he character of a piece of evidence as favorable will often turn on the context of the existing or potential evidentiary record.”
 
 Id.
 
 at 439. The prosecutor is responsible for determining whether evidence is material and should be disclosed. Thus,
 

 a prosecutor anxious about tacking too close to the wind will disclose a favorable piece of evidence. See [United States v. Agurs, 427 U.S. 97, 108 (1976).] (“[T]he prudent prosecutor will resolve doubtful questions in favor of disclosure”). This is as it should be. Such disclosure will serve to justify trust in the prosecutor as “the representative ... of a sovereignty . . . whose interest ... in a criminal prosecution is not that it shall win a case, but that justice shall be done.” Berger v. United States, 295 U.S. 78, 88 (1935). And it will tend to preserve the criminal trial, as distinct from the prosecutor’s private deliberations, as the chosen forum for ascertaining the truth about criminal accusations.
 

 Kyles, 514 U.S. at 439-40.
 

 Due process does not require simply the disclosure of “exculpatory” evidence. Evidence also must be disclosed if it provides grounds for the defense to attack the reliability, thoroughness, and good faith of the police investigation or to impeach the credibility of the State’s witnesses.
 
 See id.
 
 at 442 n.13, 445-51.
 

 
 *1195
 

 Analysis
 

 Lay contends that the prosecution violated
 
 Brady
 
 by withholding evidence of two kinds: statements by witnesses that Spike was the shooter and prior inconsistent statements by the paramedic.
 

 The evidence of another shooter
 

 Prosecutor Lucherini’s claim that the evidence regarding Spike was unreliable was not a proper reason for him to withhold the information from the defense. The only specific basis for this claim was Lucherini’s assertion that the witnesses had given inconsistent statements. However, prior inconsistent statements by other witnesses did not prevent the State from relying on those witnesses’ testimony at Lay’s trial. In fact, Kevin Page, one of the witnesses whom Lucherini deemed unreliable regarding Spike, was called by the State to testify and place Lay behind the wheel of the car from which the fatal shots came. And Page had waited a year to give this information to authorities. Also, the State presented evidence at trial that Michael Jones, nicknamed Spike, was associated with Lay’s gang and threatened one of the State’s witnesses. Thus, the record tends to support, not repel, the reliability of the evidence linking Spike to the shooting.
 

 Lucherini’s decision to withhold the information about another shooter is contrary to the Supreme Court’s concern “to preserve the criminal trial, as distinct from the prosecutor’s private deliberations, as the chosen forum for ascertaining the truth about criminal accusations.”
 
 Kyles,
 
 514 U.S. at 440.
 

 In deeming the evidence immaterial, the district court also relied on the fact that the State pleaded the alternative theory that Lay aided and abetted in the murder. There was clear evidence of two shooters and two weapons. The State therefore pleaded the alternative theory in case evidence showed that someone else shot the victim. It stresses now that the trial evidence showed the victim was killed by a rifle bullet and Lay wielded the rifle. Nevertheless, before the trial Lucherini decided it was prudent to plead the alternative theory of aiding and abetting; at the same time, however, he decided evidence of another shooter was unreliable and withheld it from the defense. These decisions were, at best, inconsistent.
 

 It appears that before trial Lucherini may have feared that if the defense received specific evidence of the existence of another shooter, it might develop reasonable doubt as to whether Lay was the actual killer and guilty of first-degree murder. Therefore, the
 
 *1196
 
 evidence was potentially material, and Lucherini had a duty to disclose it. “[T]he character of a piece of evidence as favorable will often turn on the context of the
 
 existing or potential
 
 eviden-tiary record.” Kyles, 514 U.S. at 439 (emphasis added). The State must disclose
 
 potentially
 
 exculpatory evidence if it is material; it is up to the defense to deal with problems concerning the extent to which the evidence can be used or expanded upon.
 
 Mazzan,
 
 116 Nev. at 72-73 n.6, 993 P.2d at 40 n.6.
 

 However, in light of the evidence presented at the trial, we discern no reasonable probability of a different result in either the guilt or penalty phase. The jury heard strong evidence that Lay was not the only shooter but still found him guilty of first-degree murder and agreed on a sentence of life in prison without parole. The trial testimony, if accepted, indicated that Lay fired a rifle and a rifle bullet killed the victim. Therefore, the other shooter— whether Spike or someone else — apparently fired a pistol, which did not kill the victim. Lay has not shown how the evidence regarding Spike would throw this scenario into doubt. Although Lay implies that the withheld evidence indicated that Spike was the only shooter, not Lay, this is incorrect. It indicated that Spike was a second shooter.
 

 The evidence of the paramedic’s prior inconsistent statements
 

 In several pretrial interviews, paramedic Giddens stated that the victim did not tell her anything while she treated him, but these prior statements were completely contrary to her trial testimony. This is undisputed. There is also no question that these prior inconsistent statements were favorable to the defense and material because they could have been used to impeach the credibility of a key witness for the State. Giddens was key because she appeared to be the one disinterested witness who could identify Lay, albeit indirectly, as the shooter.
 

 If Giddens had been impeached with evidence of her prior inconsistent statements, it may be that Lay still would have been convicted, and there still would have been sufficient evidence to uphold the conviction. But the proper test to determine a
 
 Brady
 
 violation is not a showing that the evidence would have been insufficient or an acquittal would have resulted if the withheld evidence had been disclosed: the question is whether there is a reasonable probability of a different result if the defense had known of Giddens’s prior inconsistent statements.
 
 See
 
 Kyles, 514 U.S. at 434-35.
 

 The three witnesses who identified Lay as the shooter or as the driver of the stolen car were all friends of the victim or even affil
 
 *1197
 
 iated with a gang at odds with Lay’s. The two who testified that Lay was the shooter originally said that they could not identify the shooter, and the one who testified that Lay was the driver did not come forward with this information for a year. Other than testimony by Giddens of the victim’s dying declaration, the only apparently neutral evidence linking Lay to the crime was his fingerprints on the stolen car. (The evidence that around the time of the crime Lay was with several other men at his home and had a rifle, shotgun, or pistol — while consistent with his guilt — does little to prove that he committed the murder.) Thus, if the defense had been able to confront Giddens with her original account that the victim said nothing and the way in which she had changed that account, we conclude that there is a reasonable probability that one or more jurors would not have been convinced beyond a reasonable doubt that Lay committed first-degree murder.
 

 The remaining question is whether the defense was given this information. Without citing any specific facts, the district court’s order stated the defense was informed that Giddens had previously related that the victim did not say anything. In concluding that the State had not violated any discovery requirements, the order also referred to “defense counsel’s admissions that they had received all the information.” We have held that “[a] district court’s determinations of fact will not be set aside if they are supported by substantial evidence.” Jones v. State, 113 Nev. 454, 470, 937 P.2d 55, 65 (1997). We conclude that these findings are not supported by substantial evidence.
 

 The only evidence that suggests that the defense was informed of Giddens’s prior inconsistent statements came at the evidentiary hearing. Brookins said that
 

 the defense already had that information because I had had to prepare a document, and I
 
 believe
 
 it was already filed with the court, and it already listed the witnesses and a summary of their testimony.
 

 Q. And is it your testimony that you prepared something saying that Miss Giddens had said previously that she [sic] could not speak because people—
 

 A. You know,
 
 I don’t remember specifically. I haven’t seen the document in five years, I don’t remember specifically.
 
 But whatever she had said to me and what her testimony was going to be would have been in that document.
 

 (Emphasis added.)
 

 This evidence is equivocal. Brookins did not remember whether the summary of Giddens’s statements specifically included the information that the victim had said nothing to her. It would not be surprising if a summary of “what her testimony was going to
 
 *1198
 
 be” did not affirmatively include what was, in effect, noninfor-mation — noninformation which did not really become significant until Giddens changed her account.
 

 The clear weight of the evidence is that the defense was not told about either Giddens’s original account that the victim said nothing in her presence or her later account that he did. Lucherini conceded that the defense was not told about the latter,
 
 i.e.,
 
 that Giddens would testify about a dying declaration by the victim. And, contrary to the district court’s finding, defense counsel did not say that ‘‘they had received all the information.” Both Schieck and Hatcher stated under oath they were never informed that Giddens would testify that the victim identified Lay as his killer or that Giddens had first stated several times that the dying man had said nothing. Nor, if defense counsel had been informed of the prior inconsistent statements, does it make sense that they failed to use them to impeach Giddens once she testified differently. Schieck and Hatcher would certainly have known to do so; they repeatedly impeached other defense witnesses with their prior inconsistent statements and failure to speak to authorities.
 

 Also, as discussed above, Lucherini admitted that he did not find it necessary to inform the defense that a person other than Lay had been identified as a shooter; therefore, it seems likely he would have felt the same way about Giddens’s inconsistent statements. At the evidentiary hearing he declared that exculpatory evidence “is evidence that explains away the crime.” This is a constricted and incorrect view of
 
 Brady
 
 material. “Due process does not require simply the disclosure of ‘exculpatory’ evidence. Evidence also must be disclosed if it provides grounds for the defense to attack the reliability, thoroughness, and good faith of the police investigation, to impeach the credibility of the state’s witnesses, or to bolster the defense case against prosecutorial attacks.”
 
 Mazzan,
 
 116 Nev. at 67, 993 P.2d at 37. “The proper question is whether evidence is ‘favorable’ ” to the defense.
 
 Id.
 
 at 71, 993 P.2d at 39 (quoting
 
 Kyles,
 
 514 U.S. at 439).
 

 Furthermore, at the evidentiary hearing Brookins assumed that the document she had prepared, summarizing the expected testimony of witnesses, had been filed with the district court and thus provided to the defense. However, the record plainly shows that neither the court nor the defense ever received such a document. Well into the trial, the district court
 
 [2]
 
 addressed Lucherini:
 

 [Y]ou are going to have witnesses testify who are not known to the defense. Any witness you’re going to have testify at that time ... if there is a written statement for them
 
 *1199
 
 I’d like to have you give it to the defense at the time they’re testifying.
 

 And if you do not have a written statement [for] them,
 
 please have your office make a brief synopsis of what they’re going to say.
 

 (Emphasis added.) Lucherini replied, “Judge,
 
 I’m obviously unprepared
 
 because I’ve never heard of a case that says we have to do that. I’m not familiar with a statute that says we have to do that.’ ’ (Emphasis added.) The court responded:
 

 [T]he defense is entitled to anything [State witnesses] may have said. There is no way they can cross-examine it to find out whether or not this statement is now in conflict with a previous statement or not,
 
 because they have no previous statement, they have nothing at all. Somewhere in someone’s notes there should be a synopsis of what the witness is going to state, otherwise you wouldn’t be calling him.
 

 (Emphasis added.) After a brief recess, the court asked:
 

 [M]ost of those witnesses have not been reduced down to any statement, is that correct?
 

 Mr. Lucherini: Judge,
 
 the State intends to call about four witnesses that were not given to the defendant.
 

 The Court: To the best of your knowledge have there been any written statements made by them?
 

 Mr. Lucherini: The second of the four has a written statement. I do not believe that it was ever given to the police department ....
 
 This person is the paramedic.
 

 At this time the State has given a copy of the paramedic report to defense counsel
 
 for them to review and to look at. And I believe if they’ll review they’ll find out that
 
 nothing in that statement is of any investigatory nature at all.
 

 (Emphasis added.)
 

 Thus, Lucherini never provided the defense with a synopsis of expected testimony for Giddens or several other witnesses. After the trial was under way and after the court insisted, Lucherini handed over Giddens’s paramedic report. But he still provided no summary of her expected testimony, which, unlike the paramedic report, would have contained critical information of an “investigatory nature” — the victim’s dying declaration — as well as Giddens’s prior inconsistent statements.
 

 We conclude that the district court manifestly erred in finding that the defense was informed of Giddens’s prior inconsistent
 
 *1200
 
 statements.
 
 [3]
 
 We also conclude that the information withheld was favorable to the defense and material under Brady.
 
 [4]
 

 CONCLUSION
 

 The State violated Brady v. Maryland, 373 U.S. 83 (1963), when it failed to inform the defense of prior inconsistent statements by a key prosecution witness. We therefore reverse Lay’s judgment of conviction and remand for retrial.
 

 [1]
 

 Lay claims alternatively that his trial counsel provided him with ineffective assistance. We do not reach this claim given our conclusion that the prosecution violated
 
 Brady.
 

 [2]
 

 District Judge Addeliar D. Guy presided at the trial.
 

 [3]
 

 The State also asserts that all its witnesses, including Giddens, were available to the defense and defense counsel are therefore responsible if they failed to obtain material evidence. It is true that
 
 “Brady
 
 does not require the State to disclose evidence which is available to the defendant from other sources, including diligent investigation by the defense.” Steese v. State, 114 Nev. 479, 495, 960 P.2d 321, 331 (1998). However, the State’s argument is flawed in two ways.
 

 First the record indicates that Giddens and other witnesses were not available to the defense as the evidence set forth above makes clear. As the district court stated during the trial: “At the request of the State several witnesses were held incommunicado from defense counsel . . . .” Second, we conclude that even diligent investigation by the defense could not be expected to uncover prior inconsistent statements made to the State in this case.
 

 [4]
 

 The district court also erred in concluding that under the law of the case the prosecutor was not required to disclose to the defense any evidence of prior inconsistent statements by witnesses. Our holding on direct appeal dealt with a prosecutor’s duty to divulge exculpatory evidence to a grand jury under NRS 172.145. We did not address the prosecutor’s duty to divulge exculpatory information to the defendant under
 
 Brady. See Lay,
 
 110 Nev. at 1197-98, 886 P.2d at 453-54. In fact, we specifically noted that “a criminal defendant is certainly entitled to impeach a witness’ credibility and testimony at trial based upon prior inconsistencies.”
 
 Id.
 
 at 1198, 886 P.2d at 453-54.